JEFFERSON COUNTY, a Political subdivision of the State of Alabama, Plaintiff,

v.

William M. ACKER, Jr., Defendant.

JEFFERSON COUNTY, a Political subdivision of the State of Alabama, Plaintiff,

v.

U.W. CLEMON, Defendant.

Nos. 93–M–0069–S, 93–M–0196–S.

United States District Court, N.D. Alabama, S.D.

March 31, 1994.

Carlos E. Heaps, A. Allen Ramsey, Heaps Ramsey & Lichtenstein, P.C., Charles S. Wagner, Jeffrey M. Sewell, Jefferson County Attorney's Office, Birmingham, AL, for Jefferson County.

William M. Acker, Jr., pro se.

U.W. Clemon, pro se.

Ronald Melvin Leaf, Gordon Lathum & Brewer, Birmingham, AL, Kevin M. Forde, Richard J. Prendergast, Chicago, IL, for Federal Judges Ass'n, amicus.

### ORDER

MOYE, District Judge.

These actions come before the Court on cross-motions for summary judgment, as well as certain procedural motions. They were filed in the District Court of Jefferson County, Alabama, seeking to recover taxes allegedly due plaintiff by defendants pursuant to Jefferson County Ordinance No. 1120 of 1987, and subsequently were removed to this Court pursuant to 28 U.S.C. § 1442. By order of February 23, 1993, these actions have been consolidated.

The parties agree that the relevant, material facts in this case are relatively simple and undisputed and that the issues presented involve questions of law only.[1] The material undisputed facts are set out in Attachment A to this Order.

The questions of law presented by the cross-motions for summary judgment are:

(1) Does Jefferson County Ordinance 1120 discriminate against defendants by reason of the federal source of their pay or compensation contrary to 4 U.S.C. §§ 105–111?

(2) If not, does Jefferson County Ordinance 1120 contravene the Constitution of the United States as applied to the defendant Article III judges?

### I. MOTIONS FOR SUMMARY JUDGMENT

#### A. Statutory Construction

Plaintiff, Jefferson County, claims the right to impose "a privilege, license or occupational tax" upon defendants pursuant to: (1) Jefferson County Ordinance No. 1120 which imposes a tax of ½ of 1% on the gross income from the "vocation, occupation, calling or profession" subject to the tax; (2) Alabama Act 406 of 1967, (3) 4 U.S.C. § 111 (the Public Salary Act), and (4) 4 U.S.C. §§ 105–110 (the Buck Act). Defendants, United States District Judges, claim that the imposition of such "a license or privilege tax" would be unconstitutional as applied to them, or, if constitutional, discriminatory as so applied by reason of the source of their pay or compensation contrary to 4 U.S.C. § 111. The issues, therefore, initially require statutory construction, for generally a court must first determine whether the applicable statutes can be construed to avoid a constitutional determination.

Alabama Act 406, approved September 7, 1967, the enabling act,[2] authorizes Jefferson

---

1. Defendant Acker points out, however, that at most, plaintiff would be entitled to partial summary judgment on the issue of liability only because the amounts which defendants would owe in the event of liability are contested.

2. Plaintiff, a creature of the State, can impose no tax without authority from the State to do so. *See* Plaintiff's brief filed May 13, 1993, page 16, and cases cited. Plaintiff has no such authority to impose an "income" tax. *See Estes v. City of*

County to impose a privilege, license or occupational tax upon all persons engaged in any vocation, occupation, calling or profession who are not required by state law to pay such a tax to the State of Alabama. The ordinance itself, enacted pursuant thereto, imposes a privilege, license or occupation tax upon all persons engaged in any "vocation, occupation, calling or profession ... within the county" not subjected by state law to a privilege, license or occupational tax. The Court regards this as an exercise of the County's taxing, not its police, power.

A federal judge, in performing his or her official duties clearly is engaged in a "vocation," "occupation," "calling" or "profession." A federal judge is not required by state law to pay a privilege, license or occupational tax to the State of Alabama. The language of Act 406 and of Ordinance 1120 therefore clearly embraces defendant judges.

In 1939, the United States Congress expressly consented to taxation of federal officers' "pay or compensation" by a state or local government.

The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation.

4 U.S.C. § 111. Further, the Buck Act of 1947 provided:

[n]o person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or

taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area.

4 U.S.C. § 106(a).

Both 4 U.S.C. § 111 and the Buck Act, 4 U.S.C. §§ 105–110, are facially applicable to the factual situation in this case since a defendant judge's salary undoubtedly constitutes "pay or compensation for personal service as an officer or employee of the United States" and "income from ... services performed in such [federal] area." The term "income tax" as used in the Buck Act, 4 U.S.C. §§ 105–109, is defined in 4 U.S.C. § 110(c) as "*any tax* levied on, with respect to, *or measured by,* net income, gross income or gross receipts," *id.* (emphasis added), and the tax here involved is clearly "measured by" gross income.

In *Bedingfield v. Jefferson County,* 527 So.2d 1270 (Ala.1988), the Alabama Supreme Court upheld Ordinance No. 1120 against the claim that it violates the Alabama Constitution. Although in its opinion the Alabama Supreme Court did not specifically address the issue of whether Ordinance No. 1120 imposes an unauthorized "income tax," [3] by affirming the trial court (which apparently did consider that issue) it necessarily ruled, at least implicitly, that the tax involved is a valid license tax and is not an income tax.

In fact, the Alabama Supreme Court had previously ruled that another city's virtually identical tax is a "license" tax permitted by the Alabama Constitution, and not an "income" tax. *Estes v. City of Gadsden,* 266 Ala. 166, 94 So.2d 744 (1957). The *Estes* Court reasoned: "[i]t will be observed that the amount of the instant tax is measured entirely by gross receipts and, therefore, it is argued that this shows that this is an income tax. But this provision is merely a manner of measuring the tax." *Id.* at 750. In arriving at that result, the *Estes* court quoted

---

*Gadsden,* 266 Ala. 166, 94 So.2d 744 (1957) and cases cited; *McPheeter v. City of Auburn,* 288 Ala. 286, 259 So.2d 833 (1972); *Bedingfield v. Jefferson County,* 527 So.2d 1270 (Ala.1988).

**3.** Since Alabama itself levies an income tax upon all its citizens (Amendment 25 to Alabama Constitution of 1901) such a tax by a county would appear to be prohibited by Article IV, Section 105 of that Constitution.

from *Nachman v. State Tax Comm'n*, 233 Ala. 628, 173 So. 25 (1937):

> [t]his court more than seventy years ago committed itself to the proposition that a tax upon "the gross amount of sales of merchandise" was not ... a *property* or *income tax*, but an occupation or privilege tax, the amount being regulated by the extent to which the privilege has been enjoyed.

*Id.* at 31 (citation omitted) (emphasis in original).

██ Nevertheless, the determination by the Alabama courts that such a County Occupational Tax is a privilege-license tax, and not an "income" tax, is not determinative in this proceeding. The determination of what is an "income tax" under the Buck Act is a question of federal law. *Howard v. Commissioners of Sinking Fund*, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953). Under federal law, in a case subject to the Buck Act, the method of measurement alone may determine whether a tax is an "income tax." In *Howard*, a Buck Act case, the Supreme Court held that an occupational tax or license fee imposed by the City of Louisville for the privilege of working within the city, albeit in a federal enclave, measured by one percent of income earned within the city, was an "income tax" within the meaning of the Buck Act. "Since the area is within the boundaries of the City of Louisville, and this tax is an income tax within the meaning of the Buck Act, the tax is valid." *Id.* at 629, 73 S.Ct. at 468. But Justice Douglas, joined by Justice Black, dissented. "The exclusions emphasize that the tax is on the *privilege* of working or doing business in Louisville. .... The Congress has not yet granted local authorities the right to tax the privilege of working for or doing business with the United States." *Id.* *See also United States v. Lewisburg Area Sch. Dist.*, 539 F.2d 301, 301–11 (3d Cir.1976) (applying the Buck Act definition to a school district occupational tax, following *Howard*).[4]

██ Similarly, the question of the applicability of 4 U.S.C. § 111, the Public Salary Act, is to be decided under federal law. In *United States v. City of Pittsburgh*, 757 F.2d 43 (3d Cir.1985), decided under the Public Salary Act, the court held that a federal court reporter's fees for the sale of transcripts were "compensation" within the meaning of 4 U.S.C. § 111 which could be taxed under Pittsburgh's business privilege tax. The court noted that "Congress was aware that the states used a variety of forms of income taxes, including gross income taxes and occupational taxes." *Id.* at 47 (citation omitted). The court held that 4 U.S.C. § 111 constitutes consent to the state or local taxation of pay or compensation received by a federal officer or employee, and "waived the United States' right to constitutional sovereign immunity from state taxation of federal employees' income." *City of Pittsburgh*, 757 F.2d at 46. *Accord: Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 812, 109 S.Ct. 1500, 1506, 103 L.Ed.2d 891 (1989).

██ Since it is undisputed that the Jefferson County Occupational Tax is measured by gross receipts, this Court must conclude that the tax is an "income tax" for purposes of the Buck Act. Although the court in *Pittsburgh* referred to the "taxation of ... income" (which normally indicates receipt of income as the taxable event) the tax involved was denominated a "business privilege tax" which, again, would normally indicate a franchise or privilege tax.

██ Defendants suggest that Ordinance 1120 violates the antidiscrimination provision of 4 U.S.C. § 111 in that a great number of potential taxpayers are exempted, or able to pay much less in taxes, because persons required to pay a license tax to the state itself are exempted from taxation under the ordinance. The record so shows. It is clear that factual discrimination is present, but not necessarily that it rises to the level of legal discrimination. Classification for the pur-

---

4. The *Lewisburg* Court apparently had no trouble with an "assessment" based on the "average income of the profession," a method of assessment virtually indistinguishable from a flat license fee for each "profession." 539 F.2d at

310. Yet nominal, per-capita taxes remain prohibited. *Id.* at 311; *United States v. City and County of Denver*, 573 F.Supp. 686 (1983). It is the principle which is important, not the practical impact upon the federal taxpayer.

pose of municipal licensing[5] does not require any rigid rule of equality of taxation. It must be substantially fair, but need not be precisely or mathematically equal in operation and effect. However, it may not be arbitrary, capricious or unreasonable. *See* Eugene McQuillin, *Municipal Corporations,* § 26.60, at 165–66 (3d ed. 1986); *McPheeter,* 259 So.2d at 833 (1972); *Estes,* 94 So.2d at 751. The record now before this Court does not demonstrate as a matter of law that any inequality here rises to such a level. Thus, the Court finds the evidence brought to its attention by defendants will not, at this juncture, support defendants' motion for summary judgment on the issue of discrimination.

Therefore, at this point the Court concludes:

1. Jefferson County Ordinance 1120 imposes a "license or privilege tax" upon the performance of defendants' duties as United States District Judges measured by that portion of their incomes earned while physically sitting in the United States Courthouse located in Jefferson County, Alabama.

2. Since the area (the United States District Courthouse in Birmingham, Alabama) is within the boundaries of (Jefferson County), and this (license or privilege) tax is an "income tax" within the meaning of the Buck Act, and purports to be levied "upon" the pay or compensation of defendants, the tax is valid facially. *Howard,* 344 U.S. at 624, 73 S.Ct. at 465; *Pittsburgh,* 757 F.2d at 46–48.

In *Howard,* however, the Court recognized that interference with the jurisdiction of the United States might constitute an exception to its brief holding:

> [t]he fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government. The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooper-

ation are their aim. It is friction, not fiction, to which we must give heed.

*Howard,* 344 U.S. at 627, 73 S.Ct. at 467. *See also* 4 U.S.C. § 107[6]; *United States v. State Tax Comm'n of Mississippi,* 412 U.S. 363, 379, 93 S.Ct. 2183, 2193, 37 L.Ed.2d 1 (1973). Consideration of whether the ordinance at issue constitutes an "interference with the jurisdiction asserted by the Federal Government" so as to involve antagonistic "sovereign rights" involves a constitutional inquiry since the boundary between sovereign federal rights and sovereign state rights is to be found in Article VI, Clause 2 of the United States Constitution. Other constitutional questions arise under Articles II (as it relates to appointment of federal judges) and III of the Constitution of the United States.

### B. Constitutional Construction

1. *Is the tax unconstitutional as a direct tax on the United States?*

Defendants contend that Jefferson County Ordinance No. 1120 contravenes the Supremacy Clause, Article VI, Clause 2, of the United States Constitution insofar as it purports to make it unlawful for defendants to *hold the office* of United States District Judge (Ordinance 1120, § 1(c)) *or perform their duties* as federal judges in Jefferson County without paying the license or privilege tax imposed by the ordinance. Ordinance 1120, § 2. It is therefore necessary to determine: (1) the present scope of constitutional intergovernmental tax immunity, and (2) to what extent that immunity is subject to statutory waiver.

To begin, it is basic that the necessary independence of both the federal and state governments forbids that either should tax the courts or the judicial process of the other. *Smith v. Short,* 40 Ala. 385 (1867). *See M'Culloch v. Maryland,* 17 U.S. (4 Wheat) 316, 429–33, 4 L.Ed. 579 (1819); 84 C.J.S. § 125 (1954 & Supp.1993). In *Smith v. Short,* the majority, proceeding directly to

---

5. The federal consent ascribed to the Public Salary Act and the Buck Act would not alter the actual nature, characteristics and legal requirements of the tax as imposed by Alabama law.

6. "The provisions of ... [4 U.S.C. § 106(a)] shall not be deemed to authorize the levy or collection of any tax on or from the United States or any instrumentality thereof...." 4 U.S.C. § 107.

the issue of the constitutional limitations on taxation of judicial process [7], reasoned:

> [t]he power of taxation remains in the States, concurrent and co-extensive with that of congress; with the sole exception of duties on imports and exports, which the States can not impose except by the consent of congress.—2 Story on Con. § 937. Therefore congress has no more the power to tax judicial process of the State courts, than have the States to tax judicial process of the national courts.

*Smith v. Short*, 40 Ala. at 389.

Chief Justice Marshall had articulated much the same principle in *M'Culloch v. Maryland*. This is an aspect of what has become known as the doctrine of intergovernmental tax immunity. In *M'Culloch*, the doctrine found its most ample expression in the famous words of Chief Justice Marshall:

> [t]hat the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control, are propositions not to be denied.[8]

*M'Culloch*, 17 U.S. at 431.

The historical basis, and current status, of the constitutional doctrine of intergovernmental tax immunity are set forth in the majority opinion in *Davis v. Michigan Dep't*

*of Treasury*, 489 U.S. at 803, 109 S.Ct. at 1500. The Court stated:

> [a]fter *Graves* [*Graves v. New York ex rel. O'Keefe*, 306 U.S. 466[, 59 S.Ct. 595, 83 L.Ed. 927] (1939), frequently referred to as the *O'Keefe* case], therefore, intergovernmental tax immunity barred only those taxes that were imposed directly on one sovereign by the other or that discriminated against a sovereign or those with whom it dealt.[9]

*Id.*, 489 U.S. at 811, 109 S.Ct. at 1505. Thus, a fundamental issue before this Court is whether the Jefferson County tax is "imposed directly on" the federal government.

*Graves* involved the constitutionality of a state *income* tax upon the salary received by an employee of the Home Owner's Loan Corporation (HOLC). *Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927 (1939). The income of the Corporation itself had been Congressionally exempted from state taxation. The Court stated that

> the only possible basis for implying a constitutional immunity from state income tax of the salary of an employee of the national government or of a governmental agency is that the economic burden of the tax is in some way passed on so as to impose a burden on the national government tantamount to an interference by one government with the other in the performance of its functions.

*Id.* at 481, 59 S.Ct. at 599. Concluding that the state income tax was not a constitutional-

---

7. Although *Smith v. Short* involved a federal stamp tax on writs issued by Alabama courts, the principle enunciated by the Alabama Supreme Court would seem to be broader.

8. Although this well-known statement has been depreciated (by Justices Holmes, Frankfurter and the second Marshall among others—*see Agricultural Bank v. Tax Comm'n*, 392 U.S. 339, 350–51, 88 S.Ct. 2173, 2179–80, 20 L.Ed.2d 1138 (1968), dissent of Marshall, J.), *M'Culloch v. Maryland* continues to be relied upon. *See e.g., Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *North Dakota v. United States*, 495 U.S. 423, 434, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990).

9. *See also McPheeter v. Auburn*, 259 So.2d at 836, where the Alabama Supreme Court, in assessing

the effect of *Graves*, quoted from *McConnell v. City of Columbus*, 172 Ohio St. 95, 15 O.O.2d 168, 173 N.E.2d 760 (1961): "[h]owever, since the decision in *Graves v. State of New York*, ... it no longer can be seriously argued that a nondiscriminatory tax on income earned for services rendered to or work done for a government represents a legally recognizable interference with the activities of that government so as to constitute a tax upon that government." 173 N.E.2d at 762 (citation omitted).

The state of the law in this area was similarly canvassed in *Western Ry. of Alabama v. State*, 241 Ala. 440, 3 So.2d 9 (1941), to much the same conclusion. *See also* Paul J. Hartman, *Federal Limitations on State and Local Taxation* chapter 6 (1981).

ly impermissible burden, the *Graves* Court pointed out:

1. The tax was non-discriminatory;

2. It is not in form or substance a tax upon the Home Owners' Loan Corporation or its property or income, nor is it paid by the corporation or the government from their fund;

3. It is measured by income which becomes the property of the taxpayer when received as compensation for his services;

4. And the tax is laid upon the privilege of receiving income, is paid from the taxpayer's private funds, and not from the funds of the government, either directly or indirectly.

*Graves*, 306 U.S. at 480, 59 S.Ct. at 598. The Court then held that:

[t]he theory, which once won a qualified approval, that a tax on income is legally or economically a tax on its source, is no longer tenable, *New York ex rel. Cohn v. Graves*, 300 U.S. 308, 313, 314[, 57 S.Ct. 466, 467, 468, 81 L.Ed. 666]; *Hale v. State Board*, 302 U.S. 95, 108 [58 S.Ct. 102, 107, 82 L.Ed. 72]; *Helvering v. Gerhardt*, [304 U.S. 405, 412–415, 58 S.Ct. 969, 971–973, 82 L.Ed. 1427 (1938)] *supra;* cf. *Metcalf & Eddy v. Mitchell* 269 U.S. 514[, 46 S.Ct. 172, 70 L.Ed. 384] [*see* particularly pp. 522–26, 46 S.Ct. at pp. 174–175]; *Fox Film Corp. v. Doyal*, 286 U.S. 123[, 128, 52 S.Ct. 546, 547, 76 L.Ed. 1010 (1932)]; *James v. Dravo Contracting Co., supra,* [302 U.S. 134], 149[, 58 S.Ct. 208, 216, 82 L.Ed. 155 (1937)]; *Helvering v. Mountain Producers Corp.*, 303 U.S. 376....[, 58 S.Ct. 623, 82 L.Ed. 907 (1938)]

*Id.*, 306 U.S. at 480–81, 59 S.Ct. at 598–99.

For purposes of this litigation, the Court believes that there are significant differences between the two cases. The respondent in *Graves* was an employee of an agency created by Congress pursuant to the Commerce power. The Court pointed out that Congress had the power to grant immunity from state taxation with respect to the agencies which it can constitutionally create. *Id.* at 478, 59 S.Ct. at 597. The federal judiciary, however, was not created by the Congress, but is coequal with the Congress itself, and the Exec-

utive, by virtue of Articles I, II and III of the Constitution.

The *Graves* Court pointed out that "when the national government lawfully acts through a corporation which it owns and controls, those activities are governmental functions entitled to whatever tax immunity attaches to those functions when carried on by the government itself through its departments." *Id.* at 477, 59 S.Ct. at 597. The nature of the activities conducted determines whether the tax involved is upon the government itself. Here, the tax is on the privilege of performing the federal judicial function itself—one of the three grand (Legislative; Executive; Judicial) federal functions. Although measured by income, the tax here, nevertheless, is imposed upon the function itself, performed by officers of the government. It is not imposed upon the receipt by defendants, as citizens of Alabama, of income indistinguishable from their income received from other sources, as in the case of the employee of the HOLC.

Thus, in *New York ex rel. Cohn v. Graves*, 300 U.S. 308, 57 S.Ct. 466, 81 L.Ed. 666 (1937) (*Ex rel. Cohn* ), one of the cases relied upon in *Graves*, 306 U.S. at 466, 59 S.Ct. at 595, the Court had upheld as constitutional a tax by a state upon income received by its resident from rents on land located without the state and interest on bonds, also physically located without the state and secured by mortgages similarly situated. The Court held such a tax:

apportioned to the ability of the taxpayer to pay it, is founded upon the protection by the state to the recipient of the income in his person, in his right to receive the income and in his enjoyment of it when received. These are rights and privileges which attach to domicil within the state. To them and to the equitable distribution of the tax burden, the economic advantage realized by the receipt of income and represented by the power to control it, bears a direct relationship.

*Ex rel. Cohn*, 300 U.S. at 313, 57 S.Ct. at 467.

*Graves*, a case involving the income of an employee of a government instrumentality, had been preceded closely in time and in principle by *James v. Dravo Contracting Co.,*

302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937). *Dravo,* which had upheld a tax on a government contractor, is regarded as a seminal case in the field of intergovernmental tax immunity. *See* Paul J. Hartman, *Federal Limitations on State and Local Taxation* § 6.15 at 289–90 (1981). There the Court pointed out:

> [t]he tax is not laid upon the Government, its property or officers.
>
> . . . .
>
> The tax is not laid upon an instrumentality of the Government.
>
> . . . . Respondent is an independent contractor. The tax is non-discriminatory.
>
> The tax is not laid upon the contract of the Government.

*James v. Dravo Contracting Co.,* 302 U.S. at 149, 58 S.Ct. at 216 (citations omitted).

The tax in the instant case, by contrast, is laid upon officers of the Government in the very performance of their governmental functions. The *Dravo* Court noted that a "tax upon their [federal instrumentalities'] operations is a direct obstruction to the exercise of Federal powers." *Dravo,* 302 U.S. at 155, 58 S.Ct. at 218 (quoting *Railroad Co. v. Peniston,* 85 U.S. (18 Wall.) 5, 37, 21 L.Ed. 787 (1873)).

The *Cohn* Court had made it plain that it was holding constitutional a state *income* tax based upon "the receipt and command of income." *Ex rel. Cohn,* 300 U.S. at 314, 57 S.Ct. at 468. That rationale subsequently became settled law in *O'Malley v. Woodrough,* 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289 (1939), but is not applicable to the privilege or occupation tax here at issue.

As the *Davis* Court pointed out, 4 U.S.C. § 111 (the Public Salary Act) merely modified the result in *Graves,* observing: "[w]hen Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretations placed on that concept by the courts." *Davis v. Michigan Dep't of Treasury,* 489 U.S. at 813, 109 S.Ct. at 1506. Congress did the same with respect to the *Buck* Act by disclaiming any intent to consent to imposition of a state tax directly upon the U.S. "or any instrumentality thereof." 4 U.S.C. § 107.

The *Davis* Court further stated:

> [i]t is true that intergovernmental tax immunity is based on the need to protect each sovereign's governmental operations from undue influence by the others. *Graves,* 306 U.S. at 481[, 59 S.Ct. at 599]; *McCulloch [M'Culloch] v. Maryland,* 4 Wheat. at 435–436. But it does not follow that private entities or individuals who are subjected to discriminatory taxation on account of their dealings with a sovereign cannot themselves receive the protection of the constitutional doctrine. Indeed, all precedent is to the contrary.[10]

*Davis,* 489 U.S. at 814, 109 S.Ct. at 1507.

In the case *sub judice,* the Jefferson County occupational tax is imposed directly upon a governmental function—the performance in the federal courthouse in Birmingham, Alabama of federal judicial functions. Those functions are the actual event taxed (the legal incidence of the tax). Thus, in *McPheeter,* the Alabama Supreme Court stated:

> [t]he ordinance imposes the tax or license fee in return for the privilege of engaging in a trade, occupation or profession in the City of Auburn and for being afforded the benefit of the facilities of the city while in the pursuit of that business.[11]
>
> \* \* \* \* \* \*
>
> Imposing payment of the tax or license fee on the individual so engaged and employed places no tax burden on Auburn University, the State or the federal government as such. *The tax is* not *levied* on the employer-employee relationship, but *on the taxable event of rendering services or following a trade, business or profession.* The

---

10. If an individual has standing to raise the issue of unconstitutional discrimination, as in *Davis,* such individual has standing to raise any constitutional question with respect to the tax involved as it affects him.

11. It is the government of the United States which receives benefit from the facilities of Jefferson County while its judicial business is being pursued, not the federal judges sitting in the courthouse located in Jefferson County.

ordinance places the tax on an employee's privilege of working in the city limits of Auburn regardless of the person's employer or the place of residence of the employee.

*McPheeter,* 259 So.2d at 835–36 (emphasis added) (citation omitted).

The Jefferson County tax, of course, would be paid by individual federal judges, the defendants, out of their own pockets without imposing any monetary (economic) burden upon the Federal Government itself. The economic burden on defendants would be no less if the tax truly were an income tax. But the tax does not purport to, and legally cannot, be based upon the *receipt* by defendants *of income* from the performance of the functions (which would violate Alabama's constitution), but instead is based squarely upon their performance, as federal judges, of the judicial function (a federal operation) itself. *See McPheeter,* 259 So.2d at 833.

Neither the Public Salary Act nor the Buck Act could, nor do they purport to, change the actual legal nature, incidence, or the effect, of the tax here involved as established by Alabama's highest court. *McPheeter,* and other Alabama cases on the actual nature and effect of the tax here, are important, and decisive, to the decision of the issues herein. The decisions of the United States Supreme Court on the constitutional issues here involved concern the actual characteristics and effects of the taxes considered, not the labels affixed thereto. If the true, actual incidence of the tax is the *receipt* of income, that is a taxable event within the jurisdiction of the State over its own citizens who receive the income; if, however, the true actual incidence of the tax is the performance of a federal judicial function, that is a taxable event without the jurisdiction of the state. The Alabama decisions establish the latter proposition.

■ Following the adoption of the XVI Amendment of the United States Constitution, the Government of the United States has jurisdiction over its citizens to tax their receipt of income; the states probably have

always had jurisdiction over their citizens to tax their receipt of income, certainly after *Graves,* 306 U.S. at 466, 59 S.Ct. at 595. The proposition that the *receipt* of income *by the citizen of a state* is a taxable event within the taxing powers of the state found early expression in the dissent of Justice Johnson in *Weston v. Charleston,* 27 U.S. (2 Pet.) 449, 470–72, 7 L.Ed. 481 (1829). In that dissent he interpreted *M'Culloch v. Maryland* as banning state and local taxes only when laid directly on the means used by the government in the exercise of its powers; but being of the opinion that the *Weston* tax was imposed on the *receipt of income* from federal securities (and thus, within his understanding of state taxing jurisdiction), he found no constitutional infirmity in the tax. In *M'Culloch v. Maryland,* Chief Justice Marshall had declared:

> [i]f we measure the power of taxation residing in a state, by the extent of sovereignty which the people of a single state possess, and can confer on its government, we have an intelligible standard, applicable to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and the property of a state unimpaired; which leaves to a state the command of all its resources, and which places beyond its reach, all those powers which are conferred by the people of the United States on the government of the Union....

17 U.S. at 429–30. *See* Paul J. Hartman, *Federal Limitations on State and Local Taxation* § 6:3 at 243. One hundred and seventy-five years later, after many intervening decisions, and the enactment of various statutes, the view that *receipt* of income, by the individual as citizen of the state, is a taxable event separate and apart from his activities in earning income in his capacity as officer or employee of the Federal Government, appears to be good law today, as construed by the United States Supreme Court. *See O'Malley v. Woodrough,* 307 U.S. at 277, 59 S.Ct. at 838.[12]

---

12. Receipt of income may be protected by the anti-diminution clause of Article III, Section 1 of the United States Constitution.

■ Article III, Section 1 of the United States Constitution provides (in part):

[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour

. . . .

In the United States's unique federal system, neither a state nor any of its subdivisions can diminish the power or authority of a judge appointed and serving under Article III. In *Harrison v. St. Louis & San Francisco R.R. Co.*, 232 U.S. 318, 34 S.Ct. 333, 58 L.Ed. 621 (1914), the Supreme Court reasserted:

[i]t may not be doubted that the judicial power of the United States as created by the Constitution and provided for by Congress pursuant to its constitutional authority, is a power wholly independent of state action and which therefore the several States may not by any exertion of authority in any form, directly or indirectly, destroy, abridge, limit or render inefficacious.

*Id.* at 328, 34 S.Ct. at 335.

■ The adjudication of litigation in the federal courts is an exertion of the judicial power of the United States, and is an integral function, and an important operation, of the federal government. The federal judiciary is, without question, a "constituent part" of the federal government. *Cf. United States v. Township of Muskegon*, 355 U.S. 484, 486, 78 S.Ct. 483, 485, 2 L.Ed.2d 436 (1958); *United States v. Boyd*, 378 U.S. 39, 47, 84 S.Ct. 1518, 1523, 12 L.Ed.2d 713 (1964). It is an "arm[ ] of the government deemed by it essential for the performance of governmental functions." *Standard Oil Co. v. Johnson*, 316 U.S. 481, 485, 62 S.Ct. 1168, 1170, 86 L.Ed. 1611 (1942). *See Department of Employment v. United States*, 385 U.S. 355, 358–60, 87 S.Ct. 464, 466–68, 17 L.Ed.2d 414 (1966) (holding Red Cross to be an instrumentality of the U.S. Government). This tax is, and legally must by Alabama law be, laid *directly* on the *performance of that function or operation*. *McPheeter*, 259 So.2d at 835–37. The tax, therefore, is unconstitutional under the contemporary doctrine of intergovernmental tax immunity as set forth in the *Davis* case unless saved by the consent contained in the Public Salary Act and the Buck Act.

The Public Salary Act and the Buck Act are, of course, statutes which have been held to be valid exercises of Congressional power with respect to their subject matter. Their purpose, as expressed in the *Pittsburgh* case, was to waive the "United States' right to constitutional sovereign immunity from state taxation of federal employees' income." *Pittsburgh*, 757 F.2d at 46; *Davis*, 489 U.S. at 812, 109 S.Ct. at 1506. They were part of the resolution of a dispute, pending for well over a century, whether a tax on the *receipt* of *income* or other payment was an indirect tax on the government payor itself and, for that reason protected by intergovernmental tax immunity. *Davis*, 489 U.S. at 812, 109 S.Ct. at 1506. *See generally* Paul J. Hartman, *Federal Limitations on State and Local Taxation*, chapter 6 and Supp.1992. There has never been any substantial question since the decision in *M'Culloch v. Maryland* that a state franchise tax upon a federal instrumentality is prohibited by the Constitution. The prohibition of such a tax is the very essence of the enduring concept of intergovernmental tax immunity. On that point, *M'Culloch v. Maryland* is as good law today as it was in 1819. *See supra* note 4 at 1539.

Thus, with respect to everything within the reach of Congressional powers, express or implied, the Court must conform to the decisions in *Pittsburgh*, and *Davis*, and hold that, to the extent of its power, Congress has waived the government's immunity from state taxation of the income of its employees. But, just as it is beyond the power of Congress to avoid the anti-diminution provisions of Article III, Sec. 1 of the United States Constitution, *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), so too, Congress cannot alter or impair the first clause of Article III. Nor can it constitutionally give effective consent to such alteration or impairment by a state. Accordingly, the Court concludes that the tax imposed by Ordinance 1120, by express intention and in

real effect, is a franchise tax imposed upon the federal judicial operations and is unconstitutional as a direct tax upon an officer and instrumentality [13] of the United States, that is, upon the sovereign itself.

**2. Does the tax violate the Anti–Diminution Clause of Article III, Section 1 of the United States Constitution?**

■ Article III, Section 1 of the Constitution of the United States provides, in part, that:

> [t]he Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Ordinance 1120 of 1987, as applied to defendants, would diminish the compensation of Article III judges, at the very least that of those who had entered office prior to the enactment of that ordinance as had defendants. Defendant Clemon was appointed June 30, 1980; Defendant Acker was appointed August 18, 1982.

Prior to *O'Malley v. Woodrough*, 307 U.S. at 277, 59 S.Ct. at 838, the Supreme Court had consistently held that even a federal net income tax could not, constitutionally, be imposed upon the salaries of federal judges. *Evans v. Gore*, 253 U.S. 245, 257, 40 S.Ct. 550, 554, 64 L.Ed. 887 (1920) (even the XVI Amendment did not so authorize. *See Evans v. Gore*, (*cf.* Holmes J., and Brandeis J., dissenting)). And in *O'Malley v. Woodrough*, adopting substantially the reasoning of the Holmes–Brandeis dissent in *Evans v.*

*Gore*, 253 U.S. at 264–66, 40 S.Ct. at 557–58,[14] the Court, overruling *Evans v. Gore*, upheld the federal income tax as constitutional only as to judges of courts of the United States taking office after June 6, 1932. "For it was the Act of June 6, 1932 that gave notice to all judges thereafter to be appointed, of the new congressional policy to include the judicial salaries of such judges in the assessment of [federal] income taxes." *O'Malley v. Woodrough*, 307 U.S. at 279, 59 S.Ct. at 838. Justice Frankfurter, in the majority opinion in *O'Malley*, stated:

> Congress [by the Revenue Act of 1932] has committed itself to the position that *a nondiscriminatory tax laid generally on net income is not, when applied to the income of a federal judge, a diminution of his salary within the prohibition of Article III, § 1 of the Constitution.* To suggest that it makes inroads upon the independence of judges who took office after Congress had thus charged them with the common duties of citizenship, by making them bear their aliquot share of the cost of maintaining the Government, is to trivialize the great historic experience on which the framers based the safeguards of Article III, § 1. To subject them to a general tax is merely to recognize that judges are also citizens, and that their particular function in government does not generate an immunity from sharing with their fellow citizens the material burden of the government whose Constitution and laws they are charged with administering.[15]

307 U.S. at 282, 59 S.Ct. at 840 (emphasis added). The Court went on to note:

---

**13.** Surely a federal judge is as integral a part of the United States as an officers club, *United States v. Tax Comm'n of Mississippi*, 412 U.S. at 363, 93 S.Ct. at 2183; *United States v. Tax Comm'n of Mississippi*, 421 U.S. at 599, 95 S.Ct. at 1872; a post exchange, *Standard Oil Co. v. Johnson*, 316 U.S. at 485, 62 S.Ct. at 1170; or the Red Cross, *Department of Employment v. United States*, 385 U.S. at 355, 87 S.Ct. at 464. "Officers" are the flesh and blood equivalents of "instrumentalities."

**14.** "I think that the moment the salary is received, whether kept distinct or not, it becomes part of the general income of the owner.... I see no greater reason for exempting the recipients while they still have the income as income

than when they have invested it in a house or bond." *Evans v. Gore*, 253 U.S. at 266, 40 S.Ct. at 557 (Holmes, J., dissenting). The tax here becomes effective even before the income is earned, and before it is paid, and before it is received.

**15.** Justice Frankfurter's analysis, with its emphasis on citizenship, echoes that of Chief Justice Marshall. As applied to this case, Alabama (Jefferson County) has full authority to tax, without discrimination, those taxable events which are aspects of defendants' Alabama citizenship and over which it has authority, but not those "conferred by the people of the United States on the government of the Union," the exercise of Article III judicial power.

[a]fter this case came here, Congress, by § 3 of the Public Salary Tax Act of 1939, amended § 22(a) [of the Revenue Act of 1932] so as to make it applicable to "judges of courts of the United States who took office on or before June 6, 1932." That section, however, is not now before us. But to the extent that what the Court now says is inconsistent with what was said in *Miles v. Graham*, 268 U.S. 501, [45 S.Ct. 601, 69 L.Ed. 1067 (1925) ], the latter cannot survive.

*Id.*, 253 U.S. at 282–83, 40 S.Ct. at 525. Before the amendment effectuated by § 3 of the Public Salary Tax Act, the Revenue Act of 1932 had provided, in § 209:

"[i]n the case of the judges of the Supreme Court, and of the inferior courts of the United States created under Article III of the Constitution, who took office on or before June 6, 1932, the compensation received as such shall not be subject to income tax under the Revenue Act of 1938 or any prior revenue Act."

*Id.* at 282, n. 10, 40 S.Ct. at 525, n. 10.

The explicit holding of the *O'Malley* Court, therefore, was that only judges appointed *after* the Revenue Act of 1932 did not enjoy Article III anti-diminution immunity with respect to the levying of the net income tax imposed thereby. But *O'Malley* approved, and set into the constitutional framework,

the proposition "that a non-discriminatory tax laid generally on net income [16] is not, when applied to the income of a federal judge, a diminution of his salary within the prohibition of Article III, § 1, of the Constitution." *O'Malley*, 307 U.S. at 282, 59 S.Ct. at 840. To this extent only, as indicated by Justice Frankfurter, the holding in *Miles v. Graham*, 268 U.S. at 509, 45 S.Ct. at 602, that "there is no power to tax a judge of the United States on account of the salary prescribed for him by law," was rejected.[17]

The legislative definition of "income tax" in 4 U.S.C. § 110(a) is inapposite to the constitutional question before this Court, the answer to which depends upon determining what is the actual legal effect and incidence of the tax. The tax imposed by Ordinance 1120 is *not* an income tax as such is generally understood, nor is it an income tax under Alabama law. *McPheeter*, 259 So.2d at 834–37; *Estes*, 94 So.2d at 746–52. That is so because it is not, in fact, a tax upon the *receipt* of income, pay, or compensation, (the taxable event held in *O'Malley* to be constitutionally permissible), but rather, is a license or privilege tax which finds its taxable event, or incidence, in the *performance* of a federal judicial function. Its incidence, thus, is upon the performance of judicial functions by a judicial officer, antecedent to the point that the salary therefor having been paid by the

---

16. *Cf.* dissent of Justices Douglas and Black (both voting with the majority in *O'Malley*) in *Howard:*

"I have not been able to follow the argument that this tax is an 'income tax' within the meaning of the Buck Act. It is by its terms a 'license fee' levied on the privilege 'of engaging in certain activities.' .... The exclusions emphasize that the tax is on the *privilege* of working or doing business in Louisville. That is the kind of tax the Kentucky Court of Appeals held it to be. The Congress has not yet granted local authorities the right to tax the privilege of working for or doing business with the United States."

*Howard*, 344 U.S. at 629, 73 S.Ct. at 468 (citation omitted). *See also Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), where Justice Douglas, writing for the majority, expressed the same idea in a First Amendment context. "It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the

privilege of delivering a sermon." *Id.* at 112, 63 S.Ct. at 874.

17. *See generally* Justice Frankfurter's later views as expressed in his dissenting opinion in *City of Detroit v. Murray Corp.*, 355 U.S. 489, 495–505, 78 S.Ct. 486, 487–92, 2 L.Ed.2d 424 (1958), where he refers to the "residuum" of continuity in the intergovernmental tax immunity cases, crediting Chief Justice Marshall with establishing the governing principles, including,

" '[t]hat the *attempt* to use the power of taxation on the means employed by the government of the Union in pursuance of the Constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give.... *Weston v. City Council of Charleston*, 27 U.S. (2 Pet.) 449, 467, 7 L.Ed. 481 as quoted by Mr. Justice Bradley in *Railroad Co. v. Peniston*, 85 U.S. (18 Wall.) 5, 38–39, 21 L.Ed. 787 (dissenting opinion).' "

*City of Detroit*, 355 U.S. at 497, 78 S.Ct. at 487 (emphasis added).

government becomes the property of the individual citizen of Alabama, mixed with all his other goods and subject to the protection and benefits he receives as a citizen of Alabama.

■ Although Congress certainly has full power to grant or waive immunity as to officers or instrumentalities created by it, and perhaps even as to itself, and perhaps even beyond the boundaries which the Supreme Court would set were Congress silent, *North Dakota v. United States,* 495 U.S. 423, 439, 110 S.Ct. 1986, 1996, 109 L.Ed.2d 420 (1990), it has no power to impair or to waive the anti-diminution clause of Article III, Section 1, as to United States judges appointed and serving thereunder. In *United States v. Will,* 449 U.S. at 228–29, 101 S.Ct. at 487–88, the Supreme Court held that Congress had no power to withdraw a judicial salary increase that had already vested. The *Will* Court stated that: "[a] paramount-indeed, an indispensable-ingredient of the concept of powers delegated to coequal branches is that each branch must recognize and respect the limits on its own authority and the boundaries of the authority delegated to the other branches." 449 U.S. at 228, 101 S.Ct. at 487.

The tax here in issue constitutes an unconstitutional diminution of defendants' compensation and is invalid as to them. Both defendants were appointed prior to the enactment of Ordinance No. 1120. The enactment of that ordinance constituted no notice to them that their salaries as federal judges would be diminished by the amount of the tax. Their entitlement to the salary prescribed by Congress for federal district judges had vested prior to the enactment of Ordinance 1120. The Court therefore finds that ordinance unconstitutional as applied to defendants as contrary to Article III, Section 1 of the Constitution of the United States.

The Court should note, however, that were it necessary it would hold that even if the ordinance had been enacted before the defendants' appointments, the tax imposed thereby would nevertheless constitute an unconstitutional diminution of defendants' salaries contrary to Article III, Section 1. It is not a true income tax, but is imposed directly upon an exclusively federal function; it effectively diminishes the compensation which the judge is entitled to receive, rather than taxing an incident of defendants' state citizenship.

Accordingly, the Court **GRANTS** defendants' motion for summary judgment on the ground that Ordinance 1120 as applied to the defendant judges contravenes Article III of the United States Constitution, as well as the Constitution's Supremacy Clause, Article VI, and **DENIES** plaintiff's motion for summary judgment. In view of the above ruling, and for the reasons set forth above, the Court does not reach the question whether ordinance 1120 is discriminatory with respect to the source of the pay or compensation taxed.

## II. ALL OTHER MOTIONS

In view of the above ruling, the Court DENIES all remaining motions as moot.

### CONCLUSION

In sum, the Court: 1) **GRANTS** defendants' motion for summary judgment; 2) **DENIES** plaintiff's motion for summary judgment; and 3) **DENIES** all other motions as MOOT.

The Clerk of Court is DIRECTED to enter final judgment in favor of defendants and against plaintiff and to assess costs against plaintiff.

SO ORDERED.

### ATTACHMENT A

### UNDISPUTED MATERIAL FACTS

1. Alabama Act 406 (1967) authorizes Jefferson County, Alabama, to impose a privilege, license or occupational tax upon all persons engaged in any vocation, occupation, calling or profession who are not required by state law to pay a privilege, license or occupational tax to the state of Alabama.

2. In 1987, the Jefferson County Commission, the governing body of the County, enacted Ordinance 1120, which imposes a privilege, license or occupational tax upon all persons engaged in any vocation, occupation, calling or profession within the County not required by state law to pay a privilege, license or occupational tax to the state.

Section 2 of Jefferson County Ordinance No. 1120 provides:

[i]t shall be unlawful for any person to engage in or follow any vocation, occupation, calling or profession ... within the county ... without paying license fees for the privilege of engaging in or following such vocation, occupation, calling or profession....

Section 1, Definitions, subsection (C), provides:

[t]he words "vocation, occupation, calling and profession" shall also mean and include the holding of any kind of office or position either by election or appointment, by any federal, state, county or city officer or employee where the services of such official or employee are rendered within Jefferson County, Alabama.

3. The effective date of the ordinance was January 1, 1988. The County Occupational Tax is measured at the rate of one-half of one percent (.005) of the gross receipts earned within the geographic boundary of Jefferson County, Alabama.

4. At all times since January 1, 1988, defendants have been employed by the United States of America as District Judges for the Northern District of Alabama pursuant to Article III of the Constitution of the United States.

5. The Northern District of Alabama is composed of 31 counties, including Jefferson County.

6. Defendants maintain their principal offices at the Hugo Black Federal Courthouse in the City of Birmingham, Jefferson County, Alabama.

7. Defendants routinely perform some but not all of their duties outside of Jefferson County, Alabama.

8. Ordinance No. 1120, section 3, provides:

[i]n cases where compensation is earned as a result of work done or services performed both within and without the County, the license fees required under this Ordinance shall be computed by determining upon the oath of the employer, or if required by the Director of Revenue upon the oath of the employee, that percentage of the compensation earned from the proportion of the work which was done or performed within the County.

Since the effective date, neither the Administrative Office of the United States Courts nor any Article III judge in the Northern District of Alabama, has ever made an oath certifying the alleged amounts of a federal judge's salary earned within and without Jefferson County.

9. Defendants are not required by any state law to pay any privilege, license or occupational tax to the state of Alabama. Defendants, however, still pay their dues (one-half of the dues of a licensed practicing attorney) to the Alabama State Bar, which is an integrated bar, and, as such, is an arm or agency of the State of Alabama. Although defendants are not and cannot be licensed to practice law, they remain sustaining or auxiliary members of the bar as they still pay their dues.

10. The Administrative Office of the United States Courts has never withheld County Occupational Tax from any federal judge or court employee pursuant to the provisions of Ordinance No. 1120.

11. All active judges of the Northern District of Alabama except defendants have paid the County Occupational Tax on differing percentages of their judicial salaries to Jefferson County without supporting those percentages by an oath or by any formal accounting procedure. At least one Article III judge (not a defendant) has paid "under protest."

12. All state District and Circuit Court Judges of the Tenth Judicial Circuit of Alabama have paid the County Occupational Tax. The three Alabama Supreme Court Justices with satellite offices in Jefferson County have paid the County Occupational Tax based on portions of their salaries.

13. The Honorable Robert S. Vance, United States Circuit Judge, who served on the Court of Appeals for the Eleventh Circuit, and who, from January 1, 1988 until his death, had his chambers in Jefferson County, Alabama, where he resided and spent most of

his time, never paid the County Occupational Tax.

14. Since 1970, the City of Birmingham, Alabama, has imposed an occupational tax at the rate of one percent of gross receipts (twice the rate of the County tax) on persons engaged in any vocation, occupation, calling or profession within the City.

15. All active judges of the Northern District of Alabama except defendant Acker have paid the City Occupational Tax.

16. Defendant Clemon has paid the City Occupational Tax on approximately 66 percent of his gross earnings during his entire tenure as a United States District Judge.

17. Since 1962, the City of Gadsden, Alabama, where defendant Acker has regularly held court for the last 11 years, has had an occupational tax ordinance similar to the County Occupational Tax, except that it contains no exemptions. The Gadsden ordinance provides in pertinent part:

> [i]t shall be unlawful for any person to engage in or follow any trade, occupation or profession, as defined in this article, within the city on and after the first day of February, 1962, without paying license fees for the privilege of engaging in or following such trade, occupation or profession, which license fees shall be measured by two (2) per cent of the gross receipts of each such person.

Gadsden, Alabama Code, Section 7–51.

18. The City of Gadsden has made no effort to exact or to collect a license fee from any of the several Article III judges who, regularly, have sat in the Middle Division of the Northern District of Alabama, which has its courthouse in the City of Gadsden.

19. Defendants have paid their Alabama state income taxes throughout their tenures as federal judges.

20. A final decree entered by defendant Acker as an Article III judge after January 1, 1988, has been formally attacked under Rule 60(b), Fed.R.Civ.P., as having been "unlawfully" entered because said order was entered by defendant Acker when he had not

paid his license fee to Jefferson County pursuant to Ordinance No. 1120.