United States Court of Appeals,

Eleventh Circuit.

No. 94-6400.

JEFFERSON COUNTY, a political subdivision of the State of Alabama, Plaintiff-Appellant,

v.

William M. ACKER, Jr., Defendant-Appellee.

JEFFERSON COUNTY, a political subdivision of the State of Alabama, Plaintiff-Appellant,

v.

U.W. CLEMON, Defendant-Appellee.

Aug. 30, 1996.

Appeals from the United States District Court for the Northern District of Alabama. (Nos. CV93-M-69-S and CV93-M-196-S) Charles A. Moye, Jr., Judge.

Before TJOFLAT, Chief Judge, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges, and HENDERSON[*], Senior Circuit Judge.

COX, Circuit Judge:

We decide in this case whether Jefferson County, Alabama, may impose on federal judges holding office under Article III of the Constitution[1] a tax for the privilege of engaging in their occupation within the county. We hold that such a tax violates the

---

[*]Senior U.S. Circuit Judge Henderson elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

[1]Article III of the Constitution vests the judicial power of the United States in the Supreme Court "and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Article III judges include federal district court judges, judges for the circuit courts of appeals, and justices of the Supreme Court.

Supremacy Clause of the Constitution.[2]

## I. FACTS AND PROCEDURAL HISTORY

Jefferson County, Alabama, sued William M. Acker, Jr., and U.W. Clemon, United States District Judges for the Northern District of Alabama, to recover delinquent county taxes due under Jefferson County Ordinance No. 1120. Ordinance No. 1120 imposes a license or privilege tax (the "privilege tax") on persons not otherwise required to pay any license or privilege tax to the State of Alabama or Jefferson County. The ordinance provides:

> It shall be unlawful for any person to engage in or follow any vocation, occupation, calling or profession ... within the County on or after the 1st day of January, 1988, without paying license fees to the County for the privilege of engaging in or following such vocation, occupation, calling or profession, which license fees shall be measured by one-half percent (1/2%) of the gross receipts of each such person.

Jefferson County, Ala., Ordinance No. 1120, § 2 (Sept. 29, 1987).

The ordinance defines "vocation, occupation, calling and profession" to include the holding of any kind of office, by election or appointment, by any federal, state, county, or city officer or employee where the officer's or employee's services are rendered within Jefferson County. *Id.* § 1(C).[3] It is undisputed

---

[2]Given the nature of the question presented in this case, we considered the issue of recusal at the outset. Our discussion of the recusal issue is included as an appendix.

[3]The ordinance also includes the following definition of "vocation, occupation, calling and profession":

> The words "vocation, occupation, calling and profession" shall mean and include the doing of any kind of work, the rendering of any kind of personal services, or the holding of any kind of position or job within Jefferson County, Alabama, by any clerk, laborer, tradesman, manager, official or other employee, including any non-resident of Jefferson County who is employed by any employer as defined in

that the ordinance facially applies to federal judges. Non-residents of Jefferson County performing work in Jefferson County must pay the privilege tax. *See id.* § 1(B). The ordinance defines "gross receipts," by which it measures the privilege tax, as the total gross amount of all salaries, wages, or other monetary payments of any kind which a person receives or is entitled to receive for work or services. *Id.* § 1(F).[4] If compensation is earned from work both inside and outside Jefferson County, the privilege tax is based on the proportion of work performed within Jefferson County. *Id.* § 3. The computation of the percentage of work done within Jefferson County must be supported by oath. *Id.*

> this section, where the relationship between the individual performing the services and the person for whom such services are rendered is, as to those services, the legal relationship of employer and employee, including also a partner of a firm or an officer of a firm or corporation, if such partner or officer receives a salary for his personal services rendered in the business of such firm or corporation, but they shall not mean or include domestic servants employed in private homes and shall not include businesses, professions or occupations for which license fees are required to be paid under any General License Code of the County or to the State of Alabama or the County by any of the following [listing sections of the Code of Alabama].

Ordinance No. 1120, § 1(B).

[4]Ordinance No. 1120, § 1(F) provides:

> The words "gross receipts" and "compensation" shall have the same meaning, and both words shall mean and include the total gross amount of all salaries, wages, commissions, bonuses or other money payment of any kind, or any other considerations having monetary value, which a person receives from or is entitled to receive from or be given credit for by his employer for any work done or personal services rendered in any vocation, occupation, calling or profession, including any kind of deductions before "take home" pay is received ...

The ordinance requires employers to withhold privilege taxes, to file returns with the Director of Revenue, and to keep and maintain certain records for five years. *Id.* § 4. The Administrative Office of the United States Courts has never withheld Jefferson County privilege taxes from the salary of any federal judge or court employee. Under the ordinance, an employer's failure to withhold the privilege tax does not relieve employees from the obligation to pay. *Id.* An employee whose employer has failed to comply with the ordinance must file a return and pay the privilege tax. *Id.* § 5.

The ordinance grants certain investigative powers to the Jefferson County Director of Revenue. These include the power to examine the books, records, and papers of any employer or licensee to determine the accuracy of any return or to determine the amount of privilege taxes due if no return was filed, as well as the power to examine any person under oath concerning any gross receipts which were or should have been shown in a return. *Id.* § 7. The Director of Revenue also may promulgate regulations for the administration and enforcement of the ordinance. *Id.* § 8.

The ordinance imposes interest and penalties for the failure to pay privilege taxes and the failure to withhold privilege taxes. *Id.* § 10(A). In addition, the ordinance alludes to other punishment for failing to comply with its requirements:

> Any person or employee who shall fail, neglect or refuse to pay a license fee ... or any employer who shall fail to withhold said license fees, or to pay over to County such license fees ..., or any person required to file a return ... who shall fail, neglect or refuse to file such return, or any person or employer who shall refuse to permit the Director of Revenue or any agent or employee designated by him ... to examine his books, records and papers for any purpose

authorized by this Ordinance ... shall upon conviction be subject to punishment within the limits of and as provided by law for each offense.  Such punishment shall be in addition to the penalties imposed under subsection (A) of this section.

*Id.* § 10(B). Alabama law provides that each violation[5] of a city or town ordinance requiring the payment of privilege taxes is punishable by a fine, as prescribed by the ordinance, of up to $500, by up to six months imprisonment, or by both.  Alabama Code § 11-51-93 (1989).  Alabama law does not appear to provide criminal sanctions for violating county ordinances requiring the payment of privilege taxes.

At least three other local governments in Alabama have ordinances requiring the payment of license or privilege taxes. The Cities of Gadsden and Birmingham, in the Northern District of Alabama,[6] and Auburn, in the Middle District of Alabama, have ordinances almost identical to Jefferson County's, though their ordinances tax gross receipts at a higher rate and, because they are city ordinances, are backed by criminal penalties under Alabama law.  *See id.*  Counsel for Jefferson County told us at oral argument that Jefferson County simply copied Birmingham's ordinance when enacting Ordinance No. 1120.

Judge Acker and Judge Clemon maintain their principal offices in the Hugo Black Federal Courthouse in Birmingham, Alabama, which lies within Jefferson County.  They routinely perform some but not all of their duties outside of Jefferson County.  Judges Acker and

---

[5]Each day one works without a license constitutes a separate offense.  Alabama Code § 11-51-93 (1989).

[6]The Northern District of Alabama holds court in both Birmingham and Gadsden.  28 U.S.C. § 81 (a)(3) and (6).

Clemon have refused to pay the privilege tax imposed by the ordinance. Before the district court's opinion in this case, all other active judges of the Northern District of Alabama paid the privilege tax on differing percentages of their judicial salaries without supporting those percentages by an oath or any formal accounting procedure. In addition, all state judges with offices in Jefferson County have paid the privilege tax based on portions of their salaries.

Jefferson County sued Judge Acker and Judge Clemon in state court to recover delinquent privilege taxes due under the ordinance. Each judge removed his case to federal court, where the cases were consolidated. The parties stipulated to the facts and submitted cross-motions for summary judgment.

The district court[7] held that, under the intergovernmental tax immunity doctrine, the ordinance is unconstitutional as applied to Judge Acker and Judge Clemon. The court concluded that the legal incidence of the privilege tax falls on the federal judicial function. *Jefferson County v. Acker,* 850 F.Supp. 1536, 1543 (N.D.Ala.1994). According to the court, the privilege tax, "by express intention and in real effect, is a franchise tax imposed upon the federal judicial operations and is unconstitutional as a direct tax upon an officer and instrumentality of the United States, that is, upon the sovereign itself." *Id.* at 1545-46.

The district court also held that applying the ordinance to Judges Acker and Clemon violates the Compensation Clause of Article

_____

[7]The Honorable Charles A. Moye, Jr., U.S. District Judge for the Northern District of Georgia, sitting by designation.

III.[8]  *Id.* at 1547.  The privilege tax diminishes a judge's compensation, rather than taxing his salary, the court held, because its incidence "is upon the performance of judicial functions by a judicial officer, antecedent to the point that the salary therefor having been paid by the government becomes the property of the individual citizen of Alabama."  *Id.* at 1547-48. Jefferson County appealed.[9]

A panel of this court reversed, holding that the ordinance may be applied to Article III judges without violating the intergovernmental tax immunity doctrine or the Compensation Clause. *Jefferson County v. Acker,* 61 F.3d 848 (11th Cir.1995).  Chief Judge Tjoflat dissented.  The panel majority disagreed with the district court's conclusion that the ordinance taxes the federal judicial function.  The panel majority determined that "the practical effect of [the ordinance] is to tax the income that federal judges derive from the performance of their judicial functions," not "to impose a license tax as a precondition to the performance of those functions."  *Id.* at 855.  And the panel majority determined that federal judges are federal officers rather than arms of the federal government.  *Id.* at 853.  Therefore, the panel held, the ordinance does not directly tax the operations of

---

[8]The Compensation Clause provides that Article III judges "shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."  U.S. Const. art. III, § 1.

[9]The district court also held that the ordinance does not discriminate against Judges Acker and Clemon by reason of the federal source of their compensation in violation of the Public Salary Act, 4 U.S.C. § 111.  On this appeal, there is no contention that this holding was erroneous and, in light of our disposition of the case, we do not address it.

the federal government in violation of the intergovernmental tax immunity doctrine. *Id.* at 856.

Also based on its determination that the practical effect of the privilege tax is that of an income tax, the panel majority held that the Compensation Clause does not bar applying the ordinance to federal judges. *Id.* According to the panel majority, "[i]t is well established that the Compensation Clause does not forbid ... levying an income tax on federal judges." *Id.* (citing *O'Malley v. Woodrough,* 307 U.S. 277, 282, 59 S.Ct. 838, 840, 83 L.Ed. 1289 (1939)).

Judges Acker and Clemon filed a suggestion for rehearing en banc. Recognizing this case to involve legal questions and principles of exceptional importance, we granted rehearing en banc to determine whether the ordinance constitutionally may be applied to Article III judges.

## II. ISSUES ON APPEAL

Two issues have been raised on appeal: (1) whether the tax imposed by Ordinance No. 1120 constitutes an unconstitutional diminution in the compensation of Article III judges; and (2) whether the tax imposed by Ordinance No. 1120 violates the Supremacy Clause as an intergovernmental tax. Because we hold that the Supremacy Clause bars the application of the ordinance to federal judges, we do not address whether the ordinance unconstitutionally diminishes federal judges' compensation.

## III. CONTENTIONS OF THE PARTIES

Jefferson County contends that the district court erred in holding that the intergovernmental tax immunity doctrine prohibits

imposing the privilege tax on federal judges.  Jefferson County argues that the Public Salary Act and the Buck Act waived the tax immunity of federal officers, including federal judges, with respect to all taxes except discriminatory taxes.  Because the privilege tax is not discriminatory, the County argues, it constitutionally may be applied to federal judges.

The County further contends that, even if Congress's waiver of federal tax immunity does not apply to the privilege tax, the intergovernmental tax immunity doctrine bars only those state taxes levied directly on the federal government itself.[10]  The privilege tax, the County argues, is not levied directly on the federal government.  Rather, it is imposed on individuals, who are employees of the federal government as opposed to its agencies or instrumentalities.  The County argues that Judges Acker and Clemon have conceded their tax immunity argument by admitting that they are subject to the Alabama state income tax:  if they were instrumentalities of the federal government, tax immunity would shield them not only from the privilege tax but also from state income taxes.

Judges Acker and Clemon contend that Congress has not waived their federal tax immunity from the privilege tax.  They argue that the privilege tax violates the intergovernmental tax immunity doctrine because the legal incidence of the privilege tax is not on

---

[10]The County recognizes that the intergovernmental tax immunity doctrine also bars taxes that discriminate against the federal government.  But the dispute on this appeal does not center on whether the privilege tax is discriminatory and, in light of our disposition of the case, we do not address whether the privilege tax is discriminatory.

the individual judge but on the performance of the federal judicial function.  The judges contend that a federal judge is the federal court when performing judicial duties.  The judges contend that state law is determinative of the legal incidence of the privilege tax.  When state law demonstrates that a tax is levied on a federal function, they argue, the practical effect of the tax need not be considered.  Judges Acker and Clemon also argue that the ordinance's onerous time-keeping and return requirements burden the federal judicial function.

## IV. DISCUSSION

We are presented with an issue of first impression.  The parties have not cited, and we have not found, any federal case addressing whether the intergovernmental tax immunity doctrine prohibits a state or local government from imposing a privilege tax on Article III judges.

We begin our analysis with an examination of the contours of the intergovernmental tax immunity doctrine, mindful that the nature of the tax and the identity of the taxpayer here differ significantly from the taxes and taxpayers at issue in previous intergovernmental tax immunity cases.  Then we apply the doctrine to the judges' challenge to the Jefferson County privilege tax. Finally, we determine whether the Public Salary Act and the Buck Act have altered the intergovernmental tax immunity doctrine's limits on state and local taxation so as to permit the imposition of the privilege tax on federal judges.

A. *The Intergovernmental Tax Immunity Doctrine*

The purpose of the intergovernmental tax immunity doctrine is

to forestall "clashing sovereignty." *United States v. New Mexico,* 455 U.S. 720, 735, 102 S.Ct. 1373, 1383, 71 L.Ed.2d 580 (1982) (quoting *McCulloch v. Maryland,* 4 Wheat 316, 430, 4 L.Ed. 579 (1819)). Born of Chief Justice Marshall's opinion in*McCulloch v. Maryland,* and aphoristically expressed in Marshall's famous dictum "the power to tax involves the power to destroy," the intergovernmental tax immunity doctrine seeks to reconcile states' sovereign taxing authority with the Supremacy Clause's protection of federal operations from state interference. *See generally New Mexico,* 455 U.S. at 730-36, 102 S.Ct. at 1380-1383; Paul J. Hartman, Federal Limitations on State and Local Taxation §§ 6:1-6:15 (1981). The Supreme Court's attempt to fashion a doctrine accommodating these competing constitutional imperatives "has been marked from the beginning by inconsistent decisions and increasingly delicate distinctions." *New Mexico,* 455 U.S. at 730, 102 S.Ct. at 1380-81.

For over a century, the Supreme Court treated Marshall's famous dictum as a constitutional mandate, *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 489, 59 S.Ct. 595, 602, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring), finding in case after case that nondiscriminatory state taxes potentially affecting the federal government—even taxes imposed on private parties dealing with the government—threatened to disrupt federal operations. The Court thus struck down, for example, state income taxes on federal employees, *Dobbins v. Commissioners of Erie County,* 41 U.S. (16 Pet.) 435, 10 L.Ed. 1022 (1842), and state sales taxes on private companies' sales to the federal government, *Panhandle Oil Co. v.*

*Mississippi ex rel. Knox,* 277 U.S. 218, 48 S.Ct. 451, 72 L.Ed. 857 (1928). The theory was that such taxes might increase the cost to the federal government of performing its functions. *United States v. County of Fresno,* 429 U.S. 452, 460, 97 S.Ct. 699, 703, 50 L.Ed.2d 683 (1977).

The theory that a nondiscriminatory tax unconstitutionally interferes with federal functions simply because it imposes an economic burden on the federal government was abandoned in *James v. Dravo Contracting,* 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937). There, the Court assumed that a state gross receipts tax levied on a federal contractor increased the cost to the government of the contractor's services, but held that the tax nevertheless did not interfere in any substantial way with the performance of federal functions. *Id.* at 160, 58 S.Ct. at 221. *Dravo* signalled the beginning of the end of constitutional tax immunity for private parties dealing with the federal government. Thus, two years later the Court overruled *Dobbins,* which had immunized federal employees from state income taxes, declaring that any economic burden on the government from an income tax on a government employee is "but the normal incident of the organization within the same territory of two governments, each possessing the taxing power," and a burden "which the Constitution presupposes." *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 487, 59 S.Ct. 595, 601, 83 L.Ed. 927 (1939) ("*O'Keefe* ").

The *O'Keefe* Court focused its analysis on whether an income tax on a federal employee obstructs or interferes with the performance of federal functions. *Id.* at 477, 481, 484, 59 S.Ct.

at 597, 599, 600. Earlier cases granting immunity from income taxes, the Court said, failed to consider whether such taxes interfered with government functions; they just assumed that the immunity of the government and its instrumentalities extended to employees of those entities. *Id.* at 481, 59 S.Ct. at 599. But "[t]he theory ... that a tax on income is legally or economically a tax on its source [was] no longer tenable" after *Dravo.* *Id.* at 480, 59 S.Ct. at 598. Thus not willing to assume any burden on government functions, *id.* at 486, 59 S.Ct. at 601, the court examined whether an income tax indeed interfered with government functions. The Court found no burden on federal functions other than the economic burden that may be passed on to the government in the form of higher labor costs. *Id.* at 481, 59 S.Ct. at 598. Concluding that such a burden does not amount to an interference with the performance of federal functions, the Court upheld the imposition of state income taxes on federal employees. *Id.* at 487, 59 S.Ct. at 601.

Later cases similarly recognized that the economic burden on the federal government of nondiscriminatory state taxes imposed on those dealing with the federal government generally does not threaten to impede the performance of federal functions. *E.g.,* *South Carolina v. Baker,* 485 U.S. 505, 521, 108 S.Ct. 1355, 1366, 99 L.Ed.2d 592 (1988) (noting that tax's entire financial burden may fall on government without rendering tax unconstitutional); *New Mexico,* 455 U.S. at 734, 102 S.Ct. at 1382 (noting that no immunity arises from federal government shouldering tax's entire economic burden); *County of Fresno,* 429 U.S. at 462, 97 S.Ct. at

704-705 (noting that economic burden on federal function does not render tax unconstitutional). With this recognition, the intergovernmental tax immunity doctrine has become somewhat more attuned to the practical realities of our federal system. But the test for determining whether a nondiscriminatory tax interferes with the federal government's functions remains highly formalistic.

Current intergovernmental tax immunity doctrine asks whether the "legal incidence," as opposed to the economic burden, of the tax falls directly on the federal government or its instrumentality. *See New Mexico,* 455 U.S. at 735, 102 S.Ct. at 1383; *County of Fresno,* 429 U.S. at 464, 97 S.Ct. at 705. A nondiscriminatory state or local tax is unconstitutional only "when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *New Mexico,* 455 U.S. at 735, 102 S.Ct. at 1383. To be an instrumentality of the government, a taxed entity must be "so intimately connected with the exercise of a power or the performance of a duty by the Government that taxation of it would be a direct interference with the functions of government itself." *Id.* (citations and internal quotation marks omitted).

The "legal incidence" test has significantly constricted federal intergovernmental tax immunity. Indeed, the Supreme Court has characterized the current doctrine's prohibition against taxes legally incident on the federal government or its instrumentalities as of "essentially symbolic importance, as the visible "consequence

of that [federal] supremacy which the constitution has declared.' " *New Mexico,* 455 U.S. at 735, 102 S.Ct. at 1383 (quoting *McCullough v. Maryland,* 4 Wheat at 436). Relegation of the doctrine to largely symbolic importance is not surprising in light of the recognition that the economic burden of nondiscriminatory state taxes does not threaten the government's operations. After all, by its very essence, a tax imposes an economic burden. If the Constitution presupposes such an economic burden, then few taxes will violate the intergovernmental tax immunity doctrine.

We do not mean to gainsay the intergovernmental tax immunity doctrine's importance in our federal system. Though it has been narrowed and beset by formalism, the doctrine has continuing vitality. Our point is that the reason for the doctrine's contraction must be appreciated to understand the scope of the doctrine's continuing vitality. The doctrine's contraction stemmed not from a weakening of the principle that, under the Supremacy Clause, states may not burden or interfere with federal operations, but from the recognition that nondiscriminatory taxes levied on private parties generally do not impede federal operations. The intergovernmental tax immunity doctrine still prohibits any state or local tax that burdens or interferes with federal operations.

Mindful of the underlying purpose of intergovernmental tax immunity, the doctrine's history, and the "actual workings of our federalism," *O'Keefe,* 306 U.S. at 490, 59 S.Ct. at 603 (Frankfurter, J., concurring), we turn to whether the Jefferson County privilege tax constitutionally may be levied on Judges Acker and Clemon.

B. *The Federal Judges' Challenge to the Privilege Tax*

Judge Acker and Judge Clemon's challenge to the privilege tax differs substantially from most intergovernmental tax immunity challenges. As far as we can tell, Judges Acker and Clemon are the first federal judges to challenge a state or local tax on intergovernmental tax immunity grounds. Moreover, because the privilege tax differs from most taxes, their objection to the privilege tax is novel. They do not allege that the privilege tax interferes with federal functions by imposing an economic burden on the federal government. The district court found that the privilege tax imposes no economic burden on the federal government itself; it is paid by individual federal judges out of their own pockets. Judges Acker and Clemon do not question this conclusion and, thus, do not make the economic-burden argument that now has been thoroughly repudiated by the intergovernmental tax immunity doctrine.[11]

The burden of which Judges Acker and Clemon complain is the ordinance's requirement that they remit privilege taxes for the privilege of lawfully performing federal judicial duties in Jefferson County. Though they object to paying a tax, they do so not for the economic reasons generally associated with objections to taxes but because the tax purports to be a precondition to the lawful performance of their federal judicial duties.

Jefferson County contends that the privilege tax does not

---

[11]Purporting to eschew the economic-burden theory, some litigants have couched their arguments simply in terms of interfering with federal functions, but these challenges invariably have amounted to challenges to the tax's economic burden.

regulate, control, or license a federal judge's performance of his duties any more than a state income tax. If Jefferson County is correct that, despite being labelled a "license fee," the privilege tax amounts to an income tax, then it constitutionally may be applied to Judges Acker and Clemon under *O'Keefe.* Thus, before attempting to ascertain the "legal incidence" of the privilege tax under the intergovernmental tax immunity doctrine, we examine the substantive nature of the privilege tax to determine whether it merely taxes the receipt of income.

1. *Whether the Privilege Tax Is In Substance An Income Tax*

To determine the nature and effect of the privilege tax, "we must look through form and behind labels to substance." *City of Detroit v. Murray Corp. of America,* 355 U.S. 489, 492, 78 S.Ct. 458, 460, 2 L.Ed.2d 441 (1958). We are the ultimate arbiters of the substance of the privilege tax. But state law defines the attributes comprising the substance of the privilege tax.

The Alabama Supreme Court has described the operational effect of a City of Auburn ordinance identical to the Jefferson County ordinance in all relevant respects. *McPheeter v. City of Auburn,* 288 Ala. 286, 259 So.2d 833 (1972). Rejecting the argument that the Auburn ordinance imposed an income tax not authorized by the state constitution, Alabama's highest court explained that

> [t]he tax is occasioned when the taxpayer performs services within the Auburn city limits, and not when the taxpayer receives income. Therefore, the ordinance taxes the privilege of working and the engagement of rendering services within the City of Auburn, and it only measures the tax due by the amount of the taxpayers' gross receipts which result from such privilege.... It is evident that the tax is not even measured by a person's income, but only by his salary or wages earned. So in no sense can the Auburn tax be considered an income tax.

*Id.* at 837.

Concerned with substance, not labels, we pay no heed to the state court's conclusion that the privilege tax is not an "income tax" under state law. In analyzing the privilege tax's natural effect, however, we accord great weight to the state court's determination of how the tax operates; if the state court's determination is a reasonable interpretation of the ordinance, we deem it conclusive. *See Gurley v. Rhoden,* 421 U.S. 200, 208, 95 S.Ct. 1605, 1610, 44 L.Ed.2d 110 (1975) (deferring to state court's reasonable determination of operating incidence of excise tax).

The Alabama Supreme Court's determination of the operation of the Auburn ordinance is a reasonable interpretation of how the identical Jefferson County ordinance operates. Our examination of the Jefferson County ordinance, within the context of Alabama law, reveals that the privilege tax is a tax on the performance of work in Jefferson County. In substance, the privilege tax does not tax the receipt of income.

The privilege tax differs fundamentally from an income tax. The ordinance purports to make it unlawful to engage in one's occupation in Jefferson County without paying the privilege tax. Ordinance No. 1120, § 2. This provision indicates that, instead of taxing the receipt of income, the privilege tax attaches to the performance of work in Jefferson County.

Other provisions of the ordinance further demonstrate that the privilege tax does not merely tax the receipt of income. The privilege tax is levied not only on income received but also on income that one is entitled to receive, *id.* § 1(F), indicating

that the ordinance is concerned with ensuring that work is taxed regardless of whether income from the work actually is received. Moreover, persons engaged in occupations or businesses for which they are required to pay state or other Jefferson County license fees are exempted from paying the privilege tax under Ordinance No. 1120. *Id.* § 1(B). We do not understand why, if the ordinance is an income tax, it exempts from its requirements persons paying license fees to Jefferson County or to the State of Alabama, license fees that are totally unrelated to income.[12] This exemption makes sense only if the ordinance aims to ensure that a license fee is paid to some unit of government for all work performed in Jefferson County.

We hold that the Jefferson County privilege tax is not, in substance, a tax on income. Though the privilege tax is measured by income, at least roughly, its other attributes remove it from any reasonable conception of an income tax. Therefore, this case is not controlled by *O'Keefe* 's holding that income taxes do not interfere with federal functions in violation of the intergovernmental tax immunity doctrine.

2. *The Legal Incidence of the Privilege Tax*

Our determination that the privilege tax does not tax the receipt of income is only the beginning of our inquiry. Regardless of what "type" of tax the privilege tax is, the intergovernmental tax immunity doctrine bars its imposition on Judges Acker and Clemon only if its legal incidence falls directly on the federal

---

[12]Attorneys, for example, must pay a flat annual license fee of $250 to the state, regardless of their income. Ala.Code § 40-12-49.

government or its instrumentality. *New Mexico,* 455 U.S. at 735, 102 S.Ct. at 1383. Judges Acker and Clemon urge that the privilege tax falls on the federal judicial function, as the district court held. Jefferson County contends that the privilege tax is imposed on individuals, not on the federal government or the federal judicial function.

Identifying the legal incidence of the privilege tax is a question of federal law. *Kern-Limerick, Inc. v. Scurlock,* 347 U.S. 110, 121, 74 S.Ct. 403, 410, 98 L.Ed. 546 (1954). However, as with our determination of the nature of the privilege tax, determining the privilege tax's legal incidence requires us to identify the substantive characteristics of the privilege tax under state law. *City of Detroit,* 355 U.S. at 493, 78 S.Ct. at 460-61. Then, we must evaluate the substance of the privilege tax under the federal standards for identifying a tax's legal incidence. *Kern-Limerick,* 347 U.S. at 121, 74 S.Ct. at 410.

We hold that the legal incidence of the tax falls on the federal judge. As the Supreme Court seems to apply the legal incidence test, the legal incidence of a tax falls on the *entity* that the taxing statute identifies as the taxpayer and contemplates paying the tax. *See United States v. State Tax Commission of Mississippi,* 421 U.S. 599, 607-610, 95 S.Ct. 1872, 1877-79, 44 L.Ed.2d 404 (1975); *Gurley,* 421 U.S. at 203-212, 95 S.Ct. at 1608-12; *Kern-Limerick,* 347 U.S. at 113-123, 74 S.Ct. at 406-411. The ordinance identifies the person engaging in work in Jefferson County as the taxpayer and contemplates that he or she will pay the

tax.[13]  Ordinance No. 1120, §§ 2, 4, 5.  Thus, the legal incidence of the privilege tax falls on Judge Acker and Judge Clemon.

3. *Whether Federal Judges Are Federal Instrumentalities*

We must determine, then, whether Judges Acker and Clemon may be considered the federal government or its instrumentalities.  The district court concluded that federal judges are federal instrumentalities.  Judges Acker and Clemon argue that a federal judge is the federal court when performing judicial duties. Jefferson County argues that Judges Acker and Clemon are individuals and employees of the federal government, not its instrumentalities.  According to the County, Judges Acker and Clemon cannot be instrumentalities of the government because, if they were, then they would be immune from state income taxes as well.

Judges Acker and Clemon may be instrumentalities of the federal government with respect to the taxation of one activity but not another.  *See New Mexico,* 455 U.S. at 740-743, 102 S.Ct. at 1386-87 (suggesting that an entity may be a federal instrumentality when one activity is taxed even if it is not an instrumentality when another activity is taxed).  The Supreme Court's description of what constitutes a federal instrumentality suggests that the activity being taxed may determine whether the taxpayer is a federal instrumentality.  To be an instrumentality, an entity must be "so closely connected to the Government that the two cannot realistically be viewed as separate entities, *at least insofar as*

_____

[13]The ordinance imposes withholding requirements on employers, but contemplates that the license fee will be paid by the person engaging in the work.

*the activity being taxed is concerned,*" or "so intimately connected with *the exercise of a power or the performance of a duty* by the Government that taxation of it would be a direct interference with the functions of government itself." *Id.* at 735, 102 S.Ct. at 1383 (citations and internal quotation marks omitted) (emphasis added).

We accept that a federal judge is not an instrumentality of the federal government when the activity being taxed is the judge's receipt of income. A judge may be no more intimately connected with the federal government when receiving income than the federal employee in *O'Keefe.* The taxation of a federal judge's income may interfere with the functions of government no more than the taxation of any other federal employee's income. But taxing a federal judge in the performance of his or her judicial duties is fundamentally different from taxing his or her income.

When performing federal judicial duties, a federal judge performs "the functions of government itself," *New Mexico,* 455 U.S. at 735, 102 S.Ct. at 1383, and cannot realistically be viewed as a separate entity from the federal court. The judge is "so intimately connected with the exercise of [federal judicial] power or the performance of a [federal judicial] duty ... that taxation of [him] would be a direct interference with the functions of government itself." *Id.* Thus, we hold that a federal judge is a federal instrumentality when the taxed activity is the judge's performance of judicial duties.

We conclude, then, that the intergovernmental tax immunity doctrine bars the imposition of the Jefferson County privilege tax on Judges Acker and Clemon. The privilege tax taxes the activity

of working in Jefferson County.  As applied to Judges Acker and Clemon, the privilege tax taxes the performance of federal judicial duties in Jefferson County.  When performing their judicial duties, Judges Acker and Clemon must be considered instrumentalities of the federal government.  The imposition of the privilege tax on Judges Acker and Clemon, therefore, amounts to a direct tax on federal instrumentalities in violation of the intergovernmental tax immunity doctrine.

Our conclusion that the Constitution bars levying the privilege tax on Judges Acker and Clemon follows not only from a formal application of the intergovernmental tax immunity doctrine but also from adherence to the doctrine's overarching purpose.  The imposition of the privilege tax on federal judges is apt to lead to the clashing sovereignty that the Supremacy Clause seeks to avoid.  By its very terms and in practical effect, Ordinance No. 1120 may be applied to federal judges only at the risk of interfering with the operation of the federal judiciary.

According to its plain language, the ordinance makes it unlawful for a federal judge to perform his or her duties in Jefferson County without paying the privilege tax.  The County argues that Alabama counties have no power to prosecute anyone criminally for failure to pay the privilege tax.[14]  While Alabama counties currently lack the power to impose criminal sanctions for failure to pay the privilege tax, the comfort that this omission

_____

[14]The ordinance is not backed by criminal penalties, the County argues, so it is "unlawful" to work without paying the privilege tax only in the sense that it is "unlawful" to refuse to pay any civil debt.

provides may be short-lived;  the Alabama legislature could of course provide a criminal penalty provision applicable to counties like the provision applicable to cities and towns.[15]

Regardless of whether a county possesses the power under Alabama law to make unlicensed work a crime, a federal judge in Jefferson County who for some reason fails to pay the privilege tax is deemed by Jefferson County to act unlawfully when he performs his judicial duties.  We have no doubt that, under the Supremacy Clause, Jefferson County could not enjoin or otherwise prevent a federal judge from performing federal duties.  But we believe that the Supremacy Clause protects the federal judiciary not only from outright obstruction but also from a requirement that a federal judge pay a fee to lawfully perform his or her duties. *See Mayo v. United States,* 319 U.S. 441, 447, 63 S.Ct. 1137, 1140, 87 L.Ed. 1504 (1943) (holding that Supremacy Clause prohibits state from requiring United States to pay privilege tax before executing a function of government);  *Johnson v. Maryland,* 254 U.S. 51, 57, 41 S.Ct. 16, 16-17, 65 L.Ed. 126 (1920) (holding that state may not require federal postal employee to obtain state driver's license before performing official duties).  Any attempt by a state or local government to tell a federal judge what he or she must do to lawfully perform federal duties offends elemental notions of

---

[15]At oral argument, counsel for Jefferson County stated that the County appears to have copied Birmingham's privilege tax ordinance verbatim.  Under Alabama law, a city, unlike a county, does have the power to criminally prosecute and punish violators of a license tax ordinance.  Ala.Code § 11-51-93.

federal supremacy.[16]

In practice, any attempt to apply Ordinance No. 1120 to federal judges threatens to lead to clashing sovereignty. Enforcement of the privilege tax requirement against federal judges risks intrusion into a federal judge's judicial affairs. To determine the amount of a federal judge's privilege tax, Jefferson County must determine what percentage of the judge's duties were performed in Jefferson County. We question whether a state or local government may inquire into precisely how and where a federal judge spends time on judicial duties; even if permissible, such an inquiry is apt to engender intergovernmental conflict. A further source of conflict is the practical effect of the privilege tax [17] on federal judges' willingness to sit or otherwise perform duties in Jefferson County.

---

[16]The Supreme Court has described the freedom of the federal courts from state interference, albeit in a different context, in this way:

> It may not be doubted that the judicial power of the United States as created by the Constitution ... is a power wholly independent of state action, and which therefore the several states may not by any exertion of authority in any form, directly or indirectly, destroy, abridge, limit, or render inefficacious. The doctrine is so elementary as to require no citation of authority to sustain it. Indeed, it stands out so plainly as one of the essential and fundamental conceptions upon which our constitutional system rests, and the lines which define it are so broad and so obvious, that ... the attempts to transgress or forget them have been so infrequent as to call for few occasions for their statement and application.

*Harrison v. St. Louis & San Francisco R.R. Co.,* 232 U.S. 318, 328, 34 S.Ct. 333, 335, 58 L.Ed. 621 (1914).

[17]The effect includes the burden of recordkeeping and disclosure requirements.

We note that, in the performance of federal judicial duties, non-resident federal judges often are called upon to sit in Jefferson County. *United States v. Tokars,* 839 F.Supp. 1578 (N.D.Ga.1993), is just one example. *Tokars* was a federal criminal racketeering prosecution involving allegations that the murder of a young woman in front of her two children was committed by two hitmen hired by her husband, an Atlanta attorney. Atlanta, the case's original venue, was saturated with publicity about the case. To safeguard the defendant's constitutional right to a fair trial, a district judge for the Northern District of Georgia granted the defendant a change of venue and spent five weeks in Birmingham trying the case. Under Ordinance No. 1120, the Atlanta-based federal judge would owe Jefferson County a percentage of her salary because she chose Birmingham as the most appropriate venue where the accused could get a fair trial.[18]

C. *Congressional Consent to State Taxation*

Congress generally has the power to consent to state taxation of federal employees, operations, and instrumentalities. *Mayo,* 319 U.S. at 446, 63 S.Ct. at 1140. Jefferson County argues that Congress, in the Public Salary Act and the Buck Act, consented to all forms of state and local taxation of federal employees, including federal judges. Therefore, we examine whether the Public Salary Act and the Buck Act constitute consent to the imposition of the privilege tax on federal judges. The district court held that,

---

[18]When questioned at oral argument about whether the *Tokars* judge owes the privilege tax for trying the case in Birmingham, counsel for Jefferson County replied: "Under ordinance yes, I believe she does, I believe she does."

under Article III, Congress may not consent to the imposition of the privilege tax on federal judges. Because we find that Congress did not consent to the imposition of the privilege tax on federal judges, we need not address Congress's power to do so.

1. *Public Salary Act*

The Public Salary Act provides in relevant part:

> The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation.

4 U.S.C. § 111. The Public Salary Act does not define the "taxation of pay or compensation for personal service" to which the United States consents. The County contends that Congress consented to the imposition on federal employees of *all* nondiscriminatory state and local taxes, including nondiscriminatory privilege taxes.

We do not interpret the Public Salary Act's consent to state taxation of federal employees' compensation as encompassing the imposition of privilege taxes such as Jefferson County's. The Public Salary Act must be read in light of the uncertain state of the intergovernmental tax immunity doctrine at the time of the Act's enactment. Before the Act was proposed, the Supreme Court held that the federal government could levy nondiscriminatory taxes on the incomes of state employees. *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 811-814, 109 S.Ct. 1500, 1505-06, 103 L.Ed.2d 891 (1989) (describing context of Act's enactment). The

primary purpose of the Act was to amend the federal tax code to clarify that the federal income tax applied to the income of all state and local government employees. *Id.* at 811, 109 S.Ct. at 1505. *See also* H.R.Rep. No. 26, 76th Cong., 1st Sess., 3-4 (1939); S.Rep. No. 112, 76th Cong., 1st Sess. 11 (1939).

Congress was concerned, however, that considerations of fairness dictated equal tax treatment of federal and state employees. *Davis,* 489 U.S. at 812, 109 S.Ct. at 1506. The Supreme Court had decided *Dravo* but had not yet held in *O'Keefe* that the intergovernmental tax immunity doctrine does not bar states from taxing the income of federal employees. Thus, Congress entertained doubts about whether states could tax federal employees' income without Congress's consent. *Id.* at 811-812, 109 S.Ct. at 1506. To ensure equal tax treatment of all government employees, therefore, Congress decided to consent to state and local taxation of federal employees' income. *Id.* at 812, 109 S.Ct. at 1506. Congress's consent turned out to be unnecessary; *O'Keefe* was decided before the Act was enacted. *Id.* Congress nevertheless enacted the provision consenting to state and local taxation of federal employees' compensation, effectively codifying the result in *O'Keefe. Id.*

The context of the Act's enactment thus reveals that Congress intended to consent to state taxation of federal employees' income to reciprocate for the imposition of the federal income tax on state employees. The Act does not consent to all state taxes on federal employees. We discern no congressional intent to consent to state taxes that in substance are not taxes on income. Thus, we

interpret "taxation of pay or compensation for personal service," 4 U.S.C. § 111, to refer to state taxes on income.  The Public Salary Act does not alter the intergovernmental tax immunity doctrine;  in effect, it just codifies the result in *O'Keefe. Davis,* 489 U.S. at 813, 109 S.Ct. at 1506.[19]

2. *The Buck Act*

The County also contends that Congress consented to taxes such as the Jefferson County privilege tax in the Buck Act, 4 U.S.C. §§ 106-110.  The Buck Act provides in relevant part:

> No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area;  and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area.

4 U.S.C. § 106(a).  Unlike the Public Salary Act, the Buck Act defines the state taxation to which the United States consents. The Buck Act defines "income tax" as "any tax levied on, with respect to, or measured by, net income, gross income, or gross

---

[19]Our interpretation of the Public Salary Act as consenting only to taxes that in substance tax income is not inconsistent with the Third Circuit's decision in *United States v. City of Pittsburgh,* 757 F.2d 43 (3rd Cir.1985).  Adopting a broad reading of "taxation of pay or compensation," the Third Circuit held that the Public Salary Act consented to Pittsburgh's levy of a privilege tax on a court reporter's transcript fee income. *Id.* at 47.  Unlike the Jefferson County privilege tax, the Pittsburgh privilege tax was in substance a tax on income.  The Third Circuit found that, despite its "privilege tax" label, the Pittsburgh tax was "clearly a tax on gross receipts or gross income from the fees." *Id.*  Though the Third Circuit did not discuss how it arrived at that conclusion, our examination of the Pittsburgh ordinance reveals that the ordinance did not include the factors that distinguish the Jefferson County ordinance from an income tax. *See* Pittsburgh, Pa., Ordinance No. 675 (Dec. 27, 1968).

receipts." *Id.* § 110(c).

The district court found that the privilege tax falls within the Buck Act's definition of an "income tax" because the privilege tax is measured by gross receipts. We agree that the Buck Act's definition of "income tax" encompasses the privilege tax. But another provision of the Buck Act removes the privilege tax from the Buck Act's consent to state taxes. Echoing the intergovernmental tax immunity doctrine's prohibition against state taxes levied directly on the federal government, the Buck Act provides that its provisions "shall not be deemed to authorize the levy or collection of any tax on or from the United States or any instrumentality thereof." *Id.* § 107(a). According to the Supreme Court, "[t]his section can only be read as an explicit congressional preservation of federal immunity from state ... taxes unconstitutional under the immunity doctrine announced by Mr. Chief Justice Marshall in *McCullough v. Maryland.*" *State Tax Commission of Mississippi,* 421 U.S. at 612, 95 S.Ct. at 1880. Therefore, the Buck Act does not alter the intergovernmental tax immunity doctrine or constitute consent to the privilege tax.

Indeed, the Buck Act's effect on the ability of states to tax federal employees is much more modest than Jefferson County suggests. According to its plain language, the Buck Act merely precludes a taxpayer from arguing that a state or locality lacks jurisdiction to tax her because she resides in a federal area or receives income from transactions or services in a federal area. 4 U.S.C. § 106(a). The Buck Act equalizes taxing power within and without federal areas, allowing states and localities to levy taxes

within federal areas "to the same extent and with the same effect" as without federal areas. *Id.* The Buck Act does not, however, affect the limits on state and local taxing power in any other way.[20]

The Supreme Court addressed the effect of the Buck Act on state and local taxation within federal areas in *Howard v. Commissioners of Sinking Fund of City of Louisville,* 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953). In *Howard,* employees of a naval ordnance plant located on federal land in Louisville, Kentucky, challenged the City of Louisville's attempt to collect from them a license fee for the privilege of working in Louisville. *Id.* at 625, 73 S.Ct. at 466. The Supreme Court noted that the United States had exclusive jurisdiction over the federal area, except as modified by statute. *Id.* at 627, 73 S.Ct. at 467. The Court held that the license fee was an "income tax" under the Buck Act, *id.* at 629, 73 S.Ct. at 468, and that the Buck Act therefore granted Louisville the right to impose the license fee on the federal

---

[20]The Buck Act was enacted in 1940 against the background of the just-enacted Public Salary Act. The Public Salary Act's consent to state income taxes failed to reach federal employees residing and working in federal areas because, without congressional consent, the states lacked jurisdiction to tax transactions occurring in federal areas. *United States v. Lewisburg Area Sch. Dist.,* 539 F.2d 301, 309 (3rd Cir.1976); *United States v. City and County of Denver,* 573 F.Supp. 686, 691 (D.Colo.1983) (citing S.Rep. No. 1625, 76th Cong., 3d Sess. 3 (1940)). The Buck Act therefore was enacted to eliminate the disparity between the income tax liability of federal employees within federal areas and those outside federal areas. *Lewisburg Area Sch. Dist.,* 539 F.2d at 309; *City and County of Denver,* 573 F.Supp. at 691. It does so by eliminating immunity based solely on the ground that the taxpayer resides in a federal area or receives income from transactions or services in a federal area. The Act does not affect claims of tax immunity based on other grounds. *See* S.Rep. No. 1625, 76th Cong., 3d Sess. 2-3 (1940).

employees working at the ordnance plant. *Id.* at 628, 73 S.Ct. at 467. The Court explained, "By virtue of the Buck Act, the tax can be levied and collected within the federal area, just as if it were not a federal area." *Id.* at 629, 73 S.Ct. at 468.

The County suggests that the Buck Act authorizes Jefferson County to levy its license fee on federal judges just as the Buck Act was held in *Howard* to authorize Louisville to levy its license fee on federal employees of the ordnance plant. The challenge to the Jefferson County privilege tax, however, differs significantly from the challenge in *Howard.* Judges Acker and Clemon do not contend that Jefferson County may not tax them because they work within a federal area. Rather, they argue that, regardless of where in Jefferson County they perform their duties, Jefferson County may not levy the privilege tax on them because to do so would amount to a direct tax on instrumentalities of the federal government in violation of the intergovernmental tax immunity doctrine. The federal employees in *Howard,* in contrast, did not contend that the license fee directly taxed the federal government. They challenged the license fee solely on the one ground barred by the Buck Act—that Louisville lacked jurisdiction to tax in a federal area—and the Supreme Court addressed only that ground. Thus, *Howard* does not address the issue presented here.

Nothing in *Howard* undermines our conclusion that the Buck Act does not alter the intergovernmental tax immunity doctrine's limits on state and local taxation. *Howard* cannot be read, for example, as an implicit rejection of intergovernmental tax immunity from privilege taxes falling within the Buck Act's definition of "income

tax." An intergovernmental tax immunity challenge, if raised by the *Howard* employees, would have failed not because the Buck Act precluded such a challenge but because the Louisville license fee did not amount to a direct tax on the federal government or its instrumentalities. Assuming that the taxed activity was working in Louisville, the *Howard* employees could not be considered the federal government or its instrumentalities when performing their duties. Unlike federal judges, employees of a naval ordnance plant realistically can be viewed as separate entities from the federal government when performing their duties; they are not "intimately connected with the exercise of a power or the performance of a duty by the Government." *New Mexico,* 455 U.S. at 736, 102 S.Ct. at 1383. Thus, that *Howard* upheld the application of the Louisville license fee to federal employees does not imply that the Buck Act precludes an intergovernmental tax immunity challenge to the application of Ordinance No. 1120 to federal judges.

## V. CONCLUSION

As applied to federal judges, the privilege tax violates the intergovernmental tax immunity doctrine as a direct tax on the federal government or its instrumentalities. We hold, therefore, that the Supremacy Clause prohibits Jefferson County from applying Ordinance No. 1120 to Judges Acker and Clemon.

AFFIRMED.

ANDERSON, Circuit Judge, dissenting, in which HENDERSON, Senior Circuit Judge, joins:

I also dissent for the several reasons set forth by Judge Birch. I can discern no principled way to avoid the conclusion that the instant county ordinance is in substance an income tax for

purposes of federal law. I respectfully submit that the majority's attempt to distinguish *Howard v. Commissioners of Sinking Fund,* 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953), is flawed. In *Howard,* the Supreme Court interpreted the Buck Act's provision that no person shall be relieved from liability for state or local *income* tax by reason of residing on federal property or working on federal property. 4 U.S.C.A. § 106(a). The Supreme Court held that an almost identically worded ordinance was in substance an income tax. The majority attempts to distinguish *Howard* by pointing to the exclusion provision in the Buck Act—i.e. that the Buck Act shall not be deemed to authorize taxation of the "United States itself or any instrumentality thereof." 4 U.S.C.A. § 107(a). Although the majority correctly points out that this provision confirms the continued applicability of the intergovernmental tax immunity doctrine, the majority's attempted distinction fails to recognize that an *income tax* is clearly not barred by the tax immunity doctrine and that the Buck Act and *Howard* indicate that the instant ordinance *is* in substance an income tax.

Having concluded that the instant tax is as a practical matter an income tax, it follows that it is not barred by the intergovernmental tax immunity doctrine because tax upon the income of a federal employee, however important the position,[1] is not a

---

[1]Because the instant tax is an income tax, and because a state or local tax upon a federal judge's income is not barred by the intergovernmental tax immunity doctrine, I need not address the majority's assertion that the acts of federal judges (in performing their official duties) are acts of the United States or an instrumentality thereof.

tax upon the United States or an instrumentality thereof.[2]  The test is whether the tax obstructs or interferes with the performance of the federal function.  *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 477, 481, 484, 59 S.Ct. 595, 597, 598-99, 600, 83 L.Ed. 927 (1939).  As Judge Birch persuasively points out, the instant tax neither obstructs nor interferes with the performance of the judge's functions.  Indeed, the district court so found.

I respectfully dissent.

BIRCH, Circuit Judge, dissenting, in which HENDERSON, Senior Circuit Judge, joins:

I respectfully dissent.  The linchpin of the majority opinion is that the tax at issue in this case is something other than an income tax.[1]  If the tax at issue is a tax on income, as defined by

---

[2]As Judge Birch points out so forcefully, the majority acknowledges this.

[1]Throughout the majority opinion, Judge Cox is steadfast and candid in acknowledging that should this tax be a tax on income, it would not run afoul of the Supremacy Clause and the intergovernmental tax immunity doctrine predicated thereon, to wit:

> But "[t]he theory ... that a tax on income is legally or economically a tax on its source [was] no longer tenable" after *[James v.] Dravo [Contracting,* 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937) ].  [*Graves v. New York ex rel. O'Keefe,* 306 U.S. 466] at 480, 59 S.Ct. [595] at 598, 83 L.Ed. 927 [ (1939) ].

Maj.Op. at ----.

> If Jefferson County is correct that, despite being labeled a "license fee," the privilege tax amounts to an income tax, then it constitutionally may be applied to Judges Acker and Clemon under *O'Keefe.*

Maj.Op. at ----.

> We have no doubt that a federal judge is not an

*federal* law,[2] the judges must pay the $668.00 per year that the

> instrumentality of the federal government when the
> activity being taxed is the judge's receipt of income.
> A judge is no more intimately connected with the
> federal government when receiving income than the
> federal employee in *O'Keefe.* The taxation of a federal
> judge's income interferes with the functions of
> government no more than the taxation of any other
> federal employee's income.

Maj.Op. at ----.

> Congress ... enacted the provision [4 U.S.C. § 111, The
> Public Salary Act] consenting to state and local
> taxation of federal employees' compensation,
> effectively codifying the result in *O'Keefe.* [*Davis v.
> Michigan Dept. of Treasury,* 489 U.S. 803 at 812, 109
> S.Ct. 1500 at 1506, 103 L.Ed.2d 891 (1989) ].

Maj.Op. at ----.

> We discern no congressional intent to consent to state
> taxes that in substance are not taxes on income. Thus,
> we interpret "taxation of pay or compensation for
> personal service," 4 U.S.C. § 111, to refer to state
> taxes on income.

*Id.*

> We agree that the Buck Act's [4 U.S.C. §§ 106-110]
> definition of "income tax" encompasses the privilege
> tax.

Maj.Op. at ----.

[2]In *United States v. City of Pittsburgh,* 757 F.2d 43, 47 (3d
Cir.1985) the Third Circuit, in adjudicating a challenge by the
United States to the taxation of an official court reporter
working in the federal district court (who the panel found to be
an officer of the court), observed:

> The United States contends, however, that section
> 111 does not apply because the City's tax is not a tax
> on compensation. It argues that the section applies
> only to income taxes, and that because the business
> privilege tax is not a net income tax, it is not tax on
> compensation within the meaning of section 111. For
> support, it cites *F.J. Busse Co. v. City of Pittsburgh,*
> 443 Pa. 349, 353, 279 A.2d 14, 16 n. 1 (1971), which
> held that the City's business privilege tax is not an
> earned income tax under Pennsylvania law. However, *the
> question of whether Congress consented to the*

county has levied.[3]  Despite the conclusion of the majority that

> *imposition of the business privilege tax is a question*
> *of Congressional intent, and therefore determined with*
> *reference to federal law.  See Howard v. Comm'rs of the*
> *Sinking Fund,* 344 U.S. 624, 628-29, 73 S.Ct. 465, 467-
> 68, 97 L.Ed. 617 (1953) (determination of what is an
> income tax under the Buck Act is a question of federal
> law).
>
> Congress, in enacting section 111, intended that
> "[federal employees] should contribute to the support
> of their State and local governments, which confer upon
> them the same privileges and benefits which are
> accorded to persons engaged in private occupations."
> S.Rep.No. 112, 76th Cong. 1st Sess. 4 (1939).  A broad
> reading of the meaning of "taxation on ...
> compensation" would comport with that intent.  Further,
> in enacting the Public Salary Tax Act of 1939, Congress
> was aware that the states used a variety of forms of
> income taxes, including gross income taxes and
> occupational taxes.  S.Rep. No. 112, 76th Cong. 1st
> Sess. 6-10 (1939).  In this case, the City's tax is
> clearly a tax on gross receipts or gross income from
> the fees.  We believe that the City's business
> privilege tax in this case is within the language and
> intent of section 111.
>
> We therefore hold that if there were any federal
> constitutional immunity from the imposition of the
> City's business privilege tax on a federal court
> reporter's transcript fee income, that immunity was
> waived by Congress.

(emphasis added).  The majority opinion attempts to
distinguish this case from the instant case in footnote 17
on page ---- of its opinion.

The majority professes not to be bound by the Alabama
Supreme Court's *McPheeter v. City of Auburn,* 288 Ala. 286,
259 So.2d 833 (1972) conclusion that the privilege tax is
not an "income tax," Maj.Op. at ----, yet, in the next
sentence the majority asserts "... if the state court's
determination is a reasonable interpretation of the
ordinance, we deem it conclusive. *See Gurley v. Rhoden,* 421
U.S. 200, 208, 95 S.Ct. 1605, 1610 [, 44 L.Ed.2d 110]
(1975)."  However, *Gurley* had nothing to do with the
determination of whether a state tax was an income tax for
the purpose of *federal* law.  Moreover, the Supreme Court
expressly accorded great weight to the state court's
findings regarding the legal incidence of a state tax
strictly within the context of state law. *Gurley,* 421 U.S.
at 208, 95 S.Ct. at 1610.

this tax "may be applied to federal judges only at the risk of interfering with the operation of the federal judiciary," Maj.Op. at ----, the independence of the federal judiciary surely will survive such a tax; as Justice Oliver Wendell Holmes (joined by Justice Louis O. Brandeis) observed:

> To require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge. I see nothing in the purpose of [Article III, § 1] of the Constitution to indicate that the judges were to be a privileged class, free from bearing their share of the cost of the institutions upon which their well-being if not their life depends.

*Evans v. Gore,* 253 U.S. 245, 265, 40 S.Ct. 550, 557, 64 L.Ed. 887 (1920) (Holmes J., dissenting). I continue to maintain that the Jefferson County tax is not a direct tax on the federal judiciary, but is an individualized tax on the *earnings* of judges and all others subject to the ordinance. Although Article III judges together compose the federal judiciary, they are also citizens of the country, state and localities where they reside. As emphasized by the Supreme Court in *O'Malley v. Woodrough,* 307 U.S. 277, 59

---

[3]The annual salary of a federal district judge is established by law and is currently $133,600. *See* 28 U.S.C. §§ 135, 461 (1993). Applying the one-half percent (.005%) privilege tax, an annual tax of $668.00 would result. It is indeed sobering to reflect upon the expenditure of taxpayers' dollars involved in the resolution of the issue before this court. The legal fees and time expended by Jefferson County in order to recover these relatively paltry amounts should be distressing enough to that county's citizens. However, considering the expenditure of federal judicial resources (a district judge's initial consideration, a three-judge panel of this court, and now an *en banc* consideration by twelve judges of our court) one can only wonder if the principle at issue here is really all that significant. Common sense whispers to me that this is the classic tempest in a teapot involving more the clash of powerful egos rather than powerful principles. The outcome of this issue may dent the coffers of Jefferson County or a few federal judges, but will speak little to the separation-of-powers principle used to justify this considerable expenditure of public resources.

S.Ct. 838, 83 L.Ed. 1289 (1939):

> To suggest that [the income tax] makes inroads upon the independence of judges who took office after Congress had thus charged them with the common duties of citizenship, by making them bear their aliquot share of the cost of maintaining the Government, is to trivialize the great historic experience on which the framers based the safeguards of Article III, § 1. To subject them to a general tax is merely to recognize that judges are also citizens, and that their particular function in government does not generate an immunity from sharing with their fellow citizens the material burden of the government whose Constitution and laws they are charged with administering.

*Id.* at 282, 59 S.Ct. at 840 (footnote omitted).

There is currently no issue before this court that suggests that the privilege tax in this case discriminates against federal employees. The original panel opinion addressed that issue and concluded that the occupational tax does not discriminate unconstitutionally against federal employees. *Jefferson County v. Acker,* 61 F.3d 848, 852-53 (11th Cir.1995), *vacated and rehearing en banc granted,* 73 F.3d 1066 (11th Cir.1996). As noted above, the dispositive issue is whether this tax is an income tax under *federal* law. In a case addressing the issue of intergovernmental tax immunity the Supreme Court admonished:

> [I]n passing on the constitutionality of a state tax "we are concerned only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Lawrence v. State Tax Commission,* 286 U.S. 276, 280, 52 S.Ct. 556, 557, 76 L.Ed. 1102. Consequently in determining whether these taxes violate the Government's constitutional immunity we must look through form and behind labels to substance.

*City of Detroit v. Murray Corp. of Amer.,* 355 U.S. 489, 492, 78 S.Ct. 458, 460, 2 L.Ed.2d 441 (1958). In this case, the majority concedes that "[t]he district court found", and "Judges Acker and Clemon do not question", "that the privilege tax imposes no

economic burden on the federal government itself; it is paid by individual federal judges out of their own pockets." Maj.Op. at ----; *see also Jefferson County v. Acker,* 850 F.Supp. 1536, 1544 (N.D.Ala.1994), *rev'd* 61 F.3d 848 (11th Cir.1995), *vacated and reh'g en banc granted,* 73 F.3d 1066 (11th Cir.1996). Yet the majority concludes that the tax at issue is not one on income.

The Supreme Court previously has upheld an analogous ordinance, also denominated as a "license fee" by the state, as a constitutionally sound income tax. *Howard v. Commissioners of Sinking Fund,* 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953). In *Howard,* the City of Louisville, Kentucky, enacted an ordinance collecting a "license tax for the privilege of working in the city, measured by one percent of all salaries, wages and commissions earned in the city." *Id.* at 625, 73 S.Ct. at 466. Federal employees working within the jurisdiction of the Navy Department contended that the tax impermissibly functioned as a fee for doing business with the United States. The Supreme Court, however, held that the tax established by the ordinance was an income tax. Quoting the Buck Act, 4 U.S.C. §§ 105-110, the Court stated that an " "income tax' means any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts." *Id.* at 628, 73 S.Ct. at 467. Although the state court had held that the tax was not an income tax, the Court declared:

> [T]he right to tax earnings within the area was not given Kentucky in accordance with the Kentucky law as to what is an income tax. The grant was given within the definition of the Buck Act, and this was for *any tax* measured by net income, gross income, or gross receipts.... We hold that the tax authorized by this ordinance was an income tax within the meaning of the federal law.

*Id.* at 628-9, 73 S.Ct. at 468 (emphasis in original). It seems to me that the Supreme Court's reasoning and disposition in *Howard* is very instructive, if not binding, with respect to this case. The majority attempts to minimize the precedential force of *Howard* by distinguishing employees of a naval ordinance plant who "can be viewed as separate entities from the federal government when performing their duties" from federal judges because the latter are " 'intimately connected with the exercise of a power or the performance of a duty by the Government.' " Maj.Op. at ---- (quoting *United States v. New Mexico,* 455 U.S. 720, 738, 102 S.Ct. 1373, 1383, 71 L.Ed.2d 580 (1982)). In *Howard,* however, the Supreme Court explicitly concluded that the tax in question—which was defined in terms identical to the tax at issue in this case—was an income tax within the meaning of the Buck Act. 344 U.S. at 468, 73 S.Ct. at 468. The Court's finding that the tax was an income tax under the Buck Act was inextricably linked to its conclusion that individuals working in a federal area within Louisville were subject to the tax. I believe that the Buck Act and the Supreme Court's interpretation thereof compel the conclusion that the Jefferson County tax, which is by its terms indistinguishable from the tax described in *Howard,* is an income tax to which federal judges in Jefferson County are subject.

The majority, relying principally on Alabama's characterization of the tax and distinguishing *Howard* in a manner that fails to explain the Supreme Court's equation of a license occupation tax with an income tax, concludes "[i]n substance, the privilege tax does not tax the receipt of income." Maj.Op. at ----

.    Focusing on two provisions of the ordinance, the majority concludes that the "tax does not merely tax the receipt of income." *Id.* at ----.  First, the majority notes that the tax is levied not only on income received but also on income that one is entitled to receive.  This tax concept is certainly not novel in the realm of *income* taxation, either state or federal.  *See In re Kochell,* 804 F.2d 84, 85 (7th Cir.1986) (stating that "in tax law a payment attributable to a person's earnings that bypasses him and goes to his designees is taxed as a payment to him"); *Bank of Coushatta v. United States,* 650 F.2d 75, 77 (5th Cir. Unit A 1981) (noting that "[a] taxpayer is considered in constructive receipt of income if it is available to him without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is made, and the Commissioner will assess taxes on the basis of this income....").  The majority posits that this provision demonstrates that "the ordinance is concerned with ensuring that work is taxed regardless of whether income from the work is actually received."  Maj.Op. at ----.  While such an explanation is not incredible, it is more likely that the traditional and typical rationale for the taxation of entitlement to income noted above is more plausible.

The majority concludes that because the ordinance exempts persons paying license fees to Jefferson County or to the State of Alabama, it "makes sense only if the ordinance aims to ensure that a license fee is paid to some unit of government for all work performed in Jefferson County."  *Id.*  An equally plausible explanation is that the exemption exists to prevent double taxation

of wage earners in that jurisdiction—particularly when the other qualifying fees may also be computed on the receipt or entitlement from wage or fee income.  The deduction or exemption of state and local taxes relative to each other or to federal taxable income is a familiar tax mechanism.  *See* 26 U.S.C. § 164(a)(1), (2) and (3) (1988) and Ala.Code § 40-18-15 (1993).

If the burden or interference of the tax is not economic, [4] what is it?  The majority informs us that the complaining judges refuse to pay the tax "because the tax *purports* to be a precondition to the *lawful* performance of their federal judicial duties", Maj.Op. at ---- (emphasis added), and holds "that a federal judge is a federal instrumentality when the taxed activity is the judge's performance of judicial duties".  *Id.* at ---- - ---- .  Nowhere in the opinion do we find an explanation of just how this declaration of lawful precondition "impedes" or "burdens" the performance of any judicial duties.  To paraphrase a popular question posed during the 1980's in fast food advertising:  "Where is the "burden' "?  Aside from offending the sensibilities of these affected judges and arousing a sense of apprehension, the ordinance is a paper tiger.  As the majority concedes "Alabama law does not

---

[4]*See* Computation of the tax set out in footnote 3 of this dissent.  Recall that the district court found as a matter of fact that the privilege tax imposes no "monetary (economic) burden on the Federal Government itself." *Acker,* 850 F.Supp. at 1544.  Moreover, there has been no analysis of facts or finding by the district court relative to the judges' contention that "the ordinance's onerous time-keeping and return requirements burden the federal judicial function." Maj.Op. at ----.  Stated differently, there is nothing in the record before us to establish or substantiate any such conclusion.  Moreover, this ordinance's record keeping and return requirements appear to be no more onerous than those commonly associated with paying one's federal and state income taxes.

appear to provide criminal sanctions for violating county ordinances requiring the payment of privilege taxes." Maj.Op. at ----. While one can appreciate that these judges, honorable men and women sworn to uphold the law, may feel uncomfortable acting "unlawfully" as the ordinance "purports" to characterize their work in the absence of payment of the tax, is that the degree of impediment or burden required to invoke application of the intergovernmental tax immunity doctrine and the Supremacy Clause of the United States Constitution? I doubt it. The burden or impediment, to the extent that one exists in this case is, at best, *de minimis* and ephemeral.

Appendix

BY THE COURT:

ON RECUSAL

We accepted the Appellee's suggestion for rehearing *en banc* of this case to determine the validity, as applied to Article III judges, of a Jefferson County tax imposed on persons working in the County. Given the nature of the controversy, we, at the outset, had to decide whether some or all judges of this Court are disqualified from the case, where nine of the *en banc* panel's twelve judges have sat in Jefferson County at least one day—and some a few days more. We also faced the fact that, though this court has no immediate sittings planned for Jefferson County, all of its judges could be sent to do judicial work in Birmingham (which is in Jefferson) in the future. Counsel for the County, however, represented at oral argument that the county has "never" attempted to collect the tax from a federal judge with no chambers

in Jefferson County.  And, no judge of this Court now keeps chambers in Jefferson County.  Nor does this Court maintain a courtroom for its use in Jefferson County.

Appellees included in their Certificate of Interested Persons this phrase:  "each Judge of the United States Circuit Court of Appeals for the Eleventh Circuit who has within the last five years performed or may perform any work or duties relating to the judicial function at any office or other location within Jefferson County, Alabama."[1]  No motions to recuse have been presented.  This listing might be construed as a suggestion of recusal;  but in any event, whether 28 U.S.C. § 455 requires recusal is an issue that judges are required to resolve on their own motion.  *See Phillips v. Joint Legislative Committee on Performance and Expenditure Review of State of Mississippi,* 637 F.2d 1014, 1020 n. 6 (5th Cir. Unit A 1981).  Because the integrity of the judiciary is in issue, moreover, the issue should be resolved "at the earliest possible opportunity."  *Union Carbide Corp. v. U.S. Cutting Service, Inc.,* 782 F.2d 710, 712 (7th Cir.1986).

Whether a judge is disqualified, that is, must not take part in deciding a case, is a question of law.  *See McCuin v. Texas Power & Light Co.,* 714 F.2d 1255, 1260 (5th Cir.1983).  Title 28 U.S.C. § 455 requires recusal whenever a judge's impartiality "might reasonably be questioned," *id.* § 455(a), or when he "has a financial interest in the subject matter in controversy ... or any

---

[1]The significance of the five-year figure is unclear.  We assume, for purposes of this opinion only, that no statute of limitations has run that would prevent the collection of taxes imposed based on the 9 October 1990 *en banc* sitting, in which most of the present Court heard argument in Jefferson County.

other interest that could be substantially affected by the outcome of the proceeding." *Id.* § 455(b)(4). The statute defines "financial interest" to mean "ownership of a legal or equitable interest, however small ... in the affairs of a party...." *Id.* § 455(d)(4).

The Ordinance may arguably authorize Jefferson County to compel the payment of half of one percent of the income received for those days worked in the County. So, for example, for those judges who sat in Birmingham on 9 October 1990—the last day the Court of Appeals has sat in Birmingham and the only day most of our judges have sat in Jefferson County—the Ordinance might mean they could be assessed for half of one percent of 1/365 of their salary for 1990, which comes to roughly a dollar and a half. We doubt the reasonable observer would think the integrity of federal judges could be bought so cheaply.

We looked at the two potential "interests" of the court's judges, in accordance with 28 U.S.C. § 455(b)(4)—financial interests and "other" interests. Considering the statutory definition of "financial interest," the term may be totally inapplicable here; but we do not rely on a strict reading. In*In re New Mexico Natural Gas Antitrust Litigation,* 620 F.2d 794, 796 (10th Cir.1980), the court wrote these words:

> We agree with the Fourth Circuit's determination that a remote, contingent benefit, such as a possible beneficial effect on future utility bills, is not a "financial interest" within the meaning of the statute. It is an "other interest," requiring disqualification under a "substantially affected" test.

*Id.* (citing *In re Virginia Elec. & Power Co.,* 539 F.2d 357 (4th Cir.1976)). That case involved an antitrust claim alleging that

various oil companies were fixing the price of natural gas at the well head. Relief was sought, among other things, on behalf of a class of residential customers in New Mexico where all the federal judges of the District of New Mexico resided. The Tenth Circuit held that the possible beneficial effect on the future utility bills of those judges was a remote and contingent benefit and, thus, was no "financial interest." Rather, the interest was an "other interest" which would require disqualification only if the interest "could be substantially affected by the outcome of the proceeding." The possible beneficial effect on future rates was found to be remote and contingent, because, among other things, the rate setting agency might not pass on the cost savings to consumers. *Accord In re Virginia Elec. & Power Co.,* 539 F.2d 357, 366-67 (4th Cir.1976).

We agree with the Tenth and Fourth Circuits that the term "financial interest" is limited to *direct* interests and does not include remote or contingent interests. We believe that the judges' interest in this case is even more remote and contingent than in the Tenth and Fourth Circuit cases. Jefferson County has represented that its tax has never been assessed against a federal judge without chambers in Jefferson County, and no judge of this Court maintains chambers in Jefferson County. Some judge of this Court might occasionally sit in Jefferson County as a member of a three-judge district court; but these duties are not common. Moreover, the possibility that a particular judge of this Court will be specially assigned in the future to hear a case in Jefferson County is wholly speculative. Considering the low

expectancy—regardless of how this case might be decided—that the tax will be assessed against judges who have no chambers or courtroom in Birmingham, we have concluded that the judges of this Court have no "financial interest" in the subject matter in controversy in this case.

Having determined that the judges' interest in this case is not a "financial interest," but is an "other interest," disqualification is required only if the interest "could be substantially affected by the outcome of the proceeding." We readily conclude that this provision does not require recusal. It is unlikely that the tax will ever be assessed against a judge of this Court because none have chambers in Jefferson County. And even if the tax were assessed against non-resident judges, we do not believe the "substantially affected" standard would be satisfied. Special assignments to sit in Birmingham are uncommon, and any such assignment would probably be of short duration and thus give rise to a de minimis tax.[2]

Our conclusion and reasoning is supported by opinions of the Codes of Conduct Committee of the Judicial Conference of the United States. The committee has interpreted language in the Code of

---

[2]For the same reasons, we also conclude that no one could reasonably question the impartiality of the judges of this Court. We also have considered whether non-financial interests in the case's outcome might require recusal of judges. We concluded that the potential administrative burdens and intrusiveness of the Ordinance (again viewed against the likelihood of no tax ever being assessed against a judge now on this court) did not require recusal. For cases finding no need to recuse for non-financial interests tied to the Article III function, see *In re Petition to Inspect & Copy Grand Jury Materials,* 735 F.2d 1261, 1266 (11th Cir.1984); *Duplantier v. United States,* 606 F.2d 654, 662-63 (5th Cir.1979).

Conduct for United States Judges in a similar way (the Code's words track closely the financial interest language of section 455). *See generally Union Carbide Corp. v. U.S. Cutting Service, Inc.,* 782 F.2d 710, 715 (7th Cir.1986) ("In matters of judicial ethics we are bound to give some weight to the view of the committee of judges that the Judicial Conference of the United States has established to advise federal judges on ethical questions."). In its Advisory Opinion No. 62, the committee advised that a judge should recuse from a case involving a utility to which he was a ratepayer only if he stood to receive savings that "might reasonably be considered substantial." The committee has also advised, in the same context, that a potential billing increase of "60 cents per month as of 1984 plus normal increases is not considered substantial." *Guide to Judiciary Policies and Procedures,* Vol. II, Ch. V, Compendium § 3.1-7[1](c) (1995).

Our decision to go forward with deciding the case was confirmed by the "rule of necessity," which rule "requires that "where all are disqualified, none are disqualified.' " *In re City of Houston,* 745 F.2d 925, 930 n. 9 (5th Cir.1984) (quoting *Pilla v. American Bar Ass'n,* 542 F.2d 56, 59 (8th Cir.1976)). *See generally United States v. Will,* 449 U.S. 200, 217-19, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980) (section 455 was not intended to abridge rule of necessity). Applying the rule, this court has held that where a case is framed as one that "involves important Article III concerns" of interest to "*all* Article III judges, wherever located," the rule of necessity instructs judges to refrain from recusal. *In re Petition to Inspect & Copy Grand Jury Materials,*

735 F.2d 1261, 1266 (11th Cir.1984). Also, this court held in *Duplantier v. United States,* 606 F.2d 654, 662-63 (5th Cir.1979) (considering constitutionality of Ethics in Government Act provisions requiring filing of personal financial reports by judges), that where all members of the judiciary have some interest in the outcome, none are disqualified, even if the levels of interest of individual judges vary somewhat. *See id.* at 662 (noting specific characteristics of interest of judges who had already filed reports). Every United States circuit judge in the country is eligible to be sent to Jefferson County to do judicial work. *See* 28 U.S.C. § 291 (assignment of circuit judges); *see also id.* § 292 (assignment of district judges). So, this case is one that involves concerns of some importance to Article III judges everywhere.[3] Thus, recusal by any one judge of this court would be contrary to the rule of necessity.

Also relevant to the recusal decision and to the application of the rule of necessity was the hardship to the participants and hindrance to judicial economy that would have resulted from a recusal *en masse.* In *City of Houston,* 745 F.2d at 931 n. 9, the court noted that recusal was inappropriate when viewed in the light of the "impracticality and unnecessary hardship that would result from recusal where the grounds are tenuous at best...." *Id.* (citations omitted); *see also id.* (noting relevance of "great

---

[3]The principles involved in this case also might affect the application of other taxes to which other federal judges in other places are subject. *See In re Pet. To Inspect & Copy Grand Jury Materials,* 735 F.2d 1261, 1266-67 (11th Cir.1984) (applying rule of necessity where principles of law involved in case are of substantial interest to all Article III judges).

inconvenience to the counsel, parties, or judge") (internal quotation marks and citations omitted). Here, recusal would have been especially impractical, because it would have entailed empaneling an entire *en banc* court of judges sitting by designation, an event for which we can find no clear precedent and which raises some jurisprudential questions.[4]

Because we have no interest, financial or other, that requires disqualification under the circumstances and because disqualification under the circumstances would also be contrary to the rule of necessity, we concluded that no member of this court was required to recuse.

ALL THE JUDGES CONCUR IN THE OPINION ON RECUSAL.

\* \* \* \* \* \*

\* \* \* \* \* \*

\* \* \* \* \* \*

---

[4]For background, see *United States v. Nixon,* 827 F.2d 1019, 1021 (5th Cir.1987);  see also *Matter of Skupniewitz,* 73 F.3d 702, 705 (7th Cir.1996);  *Martinez v. Winner,* 778 F.2d 553, 555 n. 1 (10th Cir.1985), *vacated on other grounds, Tyus v. Martinez,* 475 U.S. 1138, 106 S.Ct. 1787, 90 L.Ed.2d 333 (1986).

Our conclusion for this case would be the same even if it were plainly lawful to empanel an *en banc* court for this Circuit composed of non-disqualified judges drawn exclusively from other circuits;  the rule of necessity has been applied, by one court at least, even where fewer than all judges of a single district court would be disqualified. *See City of Houston,* 745 F.2d at 931 n. 9 (applying the rule of necessity where "no resident Houston district judge would be qualified if [the pertinent district judge] were held to be disqualified;"  district included cities in which district judges were resident other than Houston).

*　　*　　*　　*　　*　　*

*　　*　　*　　*　　*　　*

*　　*　　*　　*　　*　　*